# Exhibit C

## Consumer Safety Associates, LLC

4501 N.W. 25th Way
Boca Raton, Florida  33434

(561) 241-1900

| | |
|---|---|
| Wm. F. Kitzes, J.D.<br>Board Certified<br>Product Safety Manager<br>_____ | Safety Management<br>www.productsafety.com<br>kitzes@productsafety.com<br>_____ |
| Safety Analysis<br>Warnings<br>Expert Testimony | FAX:<br>(561) 241-1903 |

October 16, 2017

Tyler Thompson, Esquire
Dolt, Thompson, Shepherd & Kinney, PSC
13800 Lake Point Circle
Louisville, Kentucky  40206

Re:  Schall v. Suzuki

Dear Mr. Thompson,

The following report is preliminary and based on information available to date.  The issues described below are subject to change as additional information becomes available.

### *Product Safety Management*

Product safety management is a system that a reasonably prudent manufacturer puts in place <u>before</u> the first product is conceived to ensure that the final product, along with its warnings, packaging and marketing materials, is reasonably safe.  It starts with a statement of commitment for product safety from top management and develops a company's procedures to <u>identify hazards</u>, <u>assess the risk</u>, <u>apply adequate safety measures to eliminate hazards</u> from the design, places a <u>guard between users and potential injury</u> and to <u>warn users of all hazards</u> that have not been eliminated or

adequately guarded through technically feasible and economically practical safety measures.

Product safety management theory has been published and reviewed by scholars in the field for over 50 years. As can be shown from the wide dissemination and acceptance by academia, business and legal professionals, these concepts are widely used and accepted throughout the safety community.

Safety management is primarily a tool to protect consumers before they purchase products. When used correctly, these principles are a reasonable model for injury prevention. It is only after an injury that they are applied to determine if the managers failed to apply the accepted principles.

When evaluating a company's product safety management program, it is incumbent upon a reasonably prudent manufacturer to apply the following accepted safety principles to ensure that the products are reasonably safe.

1. <u>Establish and observe a written safety policy</u>. This policy should emphasize commitment to safety. In writing, it will insure all employees obtain clear guidance on safety issues. The policy should set forth a method for discussing safety responsibilities.

2. <u>Adequately identify and evaluate product hazards</u>. A hazard is the inherent capability of a product to do harm. Manufacturers, distributors, and retailers must review the potential injury-causing energy and evaluate severity and foreseeability.

3. <u>Perform an adequate risk assessment integrating product hazards, the environment, and foreseeable consumer use</u>. Once hazards are identified, the reasonably prudent manufacturer/distributor/retailer must consider the conditions of use under which the injury-causing mechanism (hazard) can cause harm to the user.

Analysis of the environment where the product will foreseeably be used, especially in light of product promotion, is critical in discerning how the consumer may foreseeably use the product, even if it is not the use intended by the manufacturer.

The product must be reasonably safe prior to distribution in commerce. If it is not possible to eliminate the hazard, the reasonably prudent manufacturer, distributor, and retailer must take steps to guard against the hazard, to adequately inform users of the danger inherent in the product, and to motivate them to avoid that danger.

4. <u>Monitor the safety performance of the product after sale and use, and take corrective action where necessary</u>. Once products are distributed to consumers, a responsible manufacturer/distributor/retailer must determine where injuries can occur, or if a product defect (including lack of adequate labeling and safety information) could create injuries. Where corrective action is needed to substantially reduce or eliminate injuries, consumer notification and additional corrective measures must be implemented to insure consumer safety.

5. <u>Develop adequate warnings and training to motivate consumers to understand and avoid dangers</u>. This is critical and relatively inexpensive. When consumers have sufficient data to make an informed decision about safety, they are in a better position to address safety issues.

*     *     *     *     *

A key precept of safety management concerns products with inherent capability to do catastrophic harm. In priority order, the duty of a reasonably prudent manufacturer is to <u>eliminate the hazard</u>, or, if this is not possible while preserving utility, <u>guard against the hazard</u>. At a minimum, the manufacturer must properly <u>inform users of the danger inherent</u> in the product and motivate them to avoid injury.

The first concept is the safety engineering hierarchy of priorities:

- Eliminate hazards

- When hazards cannot be eliminated, provide feasible safeguards against them

- Provide warnings and personal protective equipment against remaining hazards

<u>National Safety Council</u>
<u>Product Safety Management Guidelines, 1989</u>

\* \* \* \* \*

In 1931, H. W. Heinrich, Assistant Superintendent for the Engineering and Inspection Division of the Travelers Insurance Company published the primary modern text of Safety Management, *Industrial Accident Prevention, A Scientific Approach*. The results of his in-depth analysis of more than 5000 accidents revealed four fundamental principles of scientific accident prevention:

1. Executive interest and support
2. Cause-analysis
3. Selection and application of remedy
4. Executive enforcement of corrective practice

These concepts, developed by Heinrich for the Joliet Steel Works, have evolved into modern day safety management practices. Scholarly research has further developed the foundation for safety management practices.

The Consumer Product Safety Commission incorporated these principles in its 1975 publication, updated in 2006, *Handbook and Standard for Manufacturing Safer*

4

*Consumer Products*. The Commission addressed executive action, design review, distribution and corrective action.

In 1983, Harold Roland of the University of Southern California Institute of Safety and Systems Management and Brian Moriarty authored *System Safety Engineering and Management,* outlining the need for product safety policy and analysis to prevent injuries. They evaluated hazard identification, severity and a systematic approach to identify defects.

The National Safety Council first published *Product Safety Management Guidelines* in 1989 describing the relationship between marketing, manufacturing, and safety communications as a key to corporate accident prevention. Their analysis includes the hierarchy of safety management and prevention programs to substantially reduce or eliminate injuries.

### *Background and Qualifications*

I am a Board Certified Product Safety Manager and Hazard Control Manager. I hold an Executive Certificate in Safety Management from the American Society of Safety Engineers, and I am a member of the Human Factors and Ergonomics Society. I hold a Certificate in Risk Communication from the Harvard School of Public Health. For the past 30 years, I have provided risk assessment and product safety management services to attorneys, corporations and government organizations.

From 1974 to 1981, I worked at the U.S. Consumer Product Safety Commission (CPSC), part of which time I served as Legal Advisor to the Director, Office of Product Defect Identification, and was responsible for identifying products which contained a defect which could create a substantial product hazard, developing voluntary corrective action plans under Section 15 of the Consumer Product Safety Act including

the recall of substantially hazardous consumer products, and notification to the public of the danger through warnings and other media. (See attached Curriculum Vitae).

As CPSC *Program Manager for Sports, Recreation and Power Equipment (1977-1980)*, I supervised a team of engineers, epidemiologists, human factors specialists, and technical communication staff in the evaluation of injury statistics, engineering data, and product use information to achieve a reduction in consumer products injuries. Injury prevention tools combined mandatory and voluntary standards, on-product warnings, and safety education campaigns resulting in publication of the *Federal Safety Standard for Walk-Behind Power Lawn Mowers 16 CFR 1205 (1979)*. I served as Commission representative to various industry groups and standards development committees, including American National Standards Institute (ANSI), American Society for Testing & Materials (ASTM), the Outdoor Power Equipment Institute and the Sporting Goods Manufacturers Association.

I have been retained as a consultant for a number of major manufacturers, including the *Toro Company* on product safety issues, the *Vendo Company* for developing warning labels and safety bulletins, the *Jensen Corporation* for warnings and safe operation of industrial equipment, *Nobel Chemical Company* for adequacy of warnings, *Corning Glass* for evaluation of recalls, *BernzOmatic*, a division of the Newell Group, for development of point-of purchase recall displays, warnings, and advertising, *Arctic Cat, Inc.* for analysis of all-terrain vehicle off-road safety, including owner's manuals, instructions, warnings and foreseeable use, and *Visioneer*, Inc. in developing a program to upgrade computer scanners. I have developed a program for *Global Industries* to improve executive chair stability, reviewed warnings on heavy equipment for *Daewoo Heavy Industries America*, investigated safety issues for Carson Industries, Inc. and assisted *CISCO Systems* in recall development. I have designed a warning label for *Whisper Communications, Inc.*, and assisted *Wham-O, Inc.* in recall procedures. I have provided risk analysis, recall assistance and consumer warnings and instructions to Restoration *Hardware, Inc.*, have developed warnings for *Plastics Research Corp.* concerning use of decorative building materials as protective barriers. I have reviewed

advertising and promotional material for *ACH Foods* and assisted *Hilton Hotels* on recall issues.  I have advised *Swimways Corporation* on product safety management and warnings.  I have advised *AsiaEXP* on risk assessment, labeling and product standards and have assisted *Dick's Sporting Goods* in developing safety communications and warnings.  I served as Product Safety Coordinator for compliance with a Department of Justice/CPSC Consent Agreement and Order for *LM Imports*.   For *Rollz International* (Netherlands), I revised the user manual for American and Canadian markets.  I provided research and analysis on ATV safety for the National Association of Attorneys General and served as the Chairman of the *Florida Consumer's Council* (1993-2007).

I have developed on-product warnings and instructions for a number of manufacturers and distributors.  A few examples include:

- <u>Vendo Company</u> for vending machine warnings
- <u>Arctic Cat, Inc.</u> for ATV's
- <u>Whisper Communications</u> for electrocution hazards
- <u>Plastics Research Corp.</u> for building material warnings
- <u>Daewoo Heavy Industries America</u> for labeling of heavy machinery
- <u>Swimways Corporation</u> for warnings on children's pool products
- <u>Dick's Sporting Goods</u> for fitness equipment

I have lectured at the National Safety Council Annual Congress and Exposition on the following topics:

- When Risk Can't Be Eliminated:  <u>Building Adequate Warnings</u>, Los Angeles, California, 1998
- <u>Injury Prevention Analysis</u>:  Guidelines for Product Safety Managers, Chicago, Illinois, 1997
- Post Sale Corrective Action Plans - <u>Recalls and Consumer Notice</u>, Orlando, Florida, 1996

7

I have also addressed industry groups on warnings issues for the International Consumer Product Health and Safety Organization and the CPSC.

In 1991, I wrote an article for Professional Safety, the Journal of the American Society of Safety Engineers (ASSE), entitled *Safety Management and the Consumer Product Safety Commission*. Reviewed and accepted by the ASSE editorial board, the section on warnings reads in part:

> *VI. Warn users of product dangers and motivate them to avoid injury.*
>
> In addition to hazard elimination, product warnings and instructions must help the user avoid dangers, including those that remain after thorough attempts to eliminate or guard. An explicit warning that includes a signal word, statement of the hazard, appropriate behavior and description of the danger's consequences is required. A pictogram illustrating consequences often helps communicate the danger, especially to those who cannot read.

I have provided trial testimony in 8 automotive defect cases, one in Federal Court involving the failure of a master cylinder. Others have involved defect identification and recalls under the federal rules at 49 CFR 573 and 579. My most recent automotive trial testimony involved failure to warn and failure to recall (Susan Mauro et al. v. Ford Motor Co., Inc. et al., Sacramento, CA).

I have testified in trial 129 times, 8 times in Kentucky, including Pamela Morales v. American Honda Motor Co., Inc. (151 F.3d 500, 6th Circuit 1998)

8

## *Incident*

On July 19, 2013, Derek Schall was riding his 2007 Suzuki GSX-R600 motorcycle to a friend's house after church.

When another couple was leaving about 10:00 p.m., he decided to follow them out because he didn't know the area. As they left the driveway, Derek pulled out behind them. He followed them, not at a high rate of speed, always concerned about a deer jumping out.

Their brake lights disappeared behind a cornfield on a curve in the road. At the curve, he went for the front brake, down shifted, applied the front brake, but the bike would not stop. Derek went off the road and crashed into a ditch, breaking his back and rendering him a paraplegic.

## *Depositions*

Christopher McDonald

- First learned that Suzuki motorcycles were having issues with maintaining brake pressure on October 14, 2013.

- Prior to October 14, 2013, I had seen maintenance related problems.

- Had reported trouble with GSX-R brake pressure.

- Remember time when whole master cylinder was changed out and the customer came back shortly with the same problem.

- In late 2012, I started to believe there was an issue with the master cylinder causing them to lose brake pressure, I began seeing a pattern.

9

- Was not aware that Mr. Fujii from Nissin was evaluating the GSX-R master cylinder in May or June of 2009.

- Nor was I aware that Suzuki was telling Nissin that they were having brake complaints on the GSX-R.

- Finding out about brake pressure failures from dealers.

- Looked at actual brake cylinders starting in late 2011.

- In late 2011, fair to say that dealers were frustrated with master cylinder loss of pressure partly because dealers had to fix recurring problems for free.

- In 2011-2012 some dealers reported recurring problems after the master cylinder was replaced.

- By November of 2011, there was a list of 31 brake pressure losses.

- I've ridden on a motocross track where the brakes went out.

Yoshinobu Matsumoto

- Joined Suzuki April of 1986

- If gas is generated in a brake system, gas created sponginess, it would need to be purged.

- Leader of motorcycle brake group in 2012

- Important to insure gas would not generate.

- If I were shown side port in 2012, there would be questions.

- It is important for the quality control division to discover defects.

- If there is a defect, it should be reported.

- We communicate safety problems because there is a possibility the customer will be injured.

10

- Anything that has a potential of being a safety issue is being reported to SMC.

- Do not report if customer says not up to date with maintenance.

Steve Muthig

- Work with government relations department on recalls.

- 2009-2013 Service Operations Manager

- I focused more on FTIRs (Field Technical Information Report), a subset of SRs (Service Request).

- When you ask about access to information, one of the purposes that we use Siebel System for SRs -- the tread early warning reporting system.

- Siebel is where we aggregate the data that's sent to NHTSA on a quarterly basis.

- Beginning July 1, 2012, the FTIRs were submitted to NHTSA. So NHTSA had all the data through the entire period.

- They didn't approach us, saying we had a serious problem.

- They obviously felt we were handling this appropriately.

- No communication with NHTSA, no personal knowledge of what they believed or didn't believe.

- July 1, 2012 FTIRs were required to be submitted in hard copy.

- The other data submitted on a quarterly basis in categories such as service brakes.

- System counts service requests that apply to categories in aggregate.

- I'm assuming that we provide all the data required, but have no personal knowledge.

11

Bryan Malyszek

- In 10 years as a mediator, I don't recall a customer claim has ever been substantiated as an actual product defect.

*Pertinent Facts*

- Suzuki's Code of Conduct states we will never neglect any quality problem that may affect our customers safety or security, noticed during development, production or after sale.

- In 2008, Suzuki certified to ISO 9001.

- ISO 9001 states that manufacturers shall ensure that a product which does not conform to product requirements is identified and controlled to prevent its unintended use or delivery, and to eliminate the nonconformity or take action when detected after delivery.

- Suzuki failed to provide reports to NHTSA under the Early Warning System to allow regulators to evaluate consumer complaints of the service brake system in a timely manner.

- Suzuki failed to report a defect related to motor vehicle safety on the GSX-R brake failure after clear knowledge of the defect, well before the injury to Derek Schall.

- Suzuki failed to apply automotive Failure Mode and Effects Analysis developed by Chrysler, Ford and General Motors in 1995 to identify defects in front brake master cylinders.

- As early as July 2004, Suzuki was aware of brake fade in GSX-R racing and that replacing the master cylinder assembly with an after market piece would eliminate the problem.

- By 2010, SMC and SMAI (ASMC) were aware of loss of brake pressure.

- By November 2011, 31 incidents of brake failure were identified.

- By late 2011, dealers were frustrated with providing free fixes for repeated loss of master cylinder pressure.

- By January 2012, ASMC email notes a customer's GSX-R front brake system was inspected 3 times. Each time air was present in system after sitting for a period of time.

- By April 10, 2012, loss of front brake pressure was reproduced.

- By June 6, 2012, brake failure was reported based on dealer calls to tech line, 60 incidents were identified.

- June 11, 2012 -- ASMC concerned that brake loss issue might be reported to NHTSA because the possibility of safety problem cannot be denied.

- August 2, 2012 -- Trip Report -- ASMC Chairman Mr. Iwasaki
  Purpose -- Corrective actions on critical quality problems with GSX-R
  Result -- Corrective action -- master cylinder piston will be replaced

- September 26, 2012 -- Loss of pressure in front brakes
  FTIR US201208A00039
  10 FTIRs (Field Technical Information Report) with similar events

13

      Cause is poor maintenance.
      Port on side causes insufficient bleeding from master cylinder.
      Since poor maintenance is cause, no action will be taken for production vehicles.
      Air bubbles in fluid, brakes become ineffective.
      Owner's manual instructs user to check the effectiveness by performing pre-operation check. If abnormalities found in pre-check, there is sufficient predictability for the user and this is not a safety issue.
      However, change in placement of master cylinder port for next model to make it easier for air bubbles to escape.

- October 2, 2012 -- It is a rule to check that the brake not spongy before driving. It cannot be regarded as a failure.

- October 4, 2012 -- ASMC is very worried about the possibility of brake failure occurrence when the vehicle is running.

- By October 20, 2012, 81 cases of brake failure are reported.

- December 2012 -- SMC speculated that the actual number of cases could be in the hundreds.

- December 5, 2012 -- Kitabatake to Matsumoto -- It is my understanding that SMC top management knows of brake pressure loss. My understanding is that it is very dangerous. Speed of response is slow. It is a recall matter. It involves human lives.

- December 14, 2012 -- U.S. Trip Report -- Tread Act meeting, NHTSA focusing more on user information than EWR.

- February 20, 2013 -- We want to avoid recall in Spring season, March to May, when dealers are extremely busy and it may have negative impact on sales.

- April 9, 2013  --  SMAI Service thinks brake matter is a serious safety issue. If Suzuki fails to respond, we cannot defend ourselves.

- July 2013  --  Derek Schall's loss of brakes and injury

- October 18, 2013  --  Suzuki's notification to NHTSA

### *Opinions*

The opinions contained herein are stated to a reasonable degree of certainty in the areas of safety management, warnings and safety communications.

1. Suzuki failed to act as a reasonably prudent manufacturer and distributor to adequately protect GSX-R riders from the devastating injuries from loss of brake pressure during the foreseeable and intended use of their motorcycles.

2. Suzuki failed to perform an adequate hazard identification and risk assessment to identify GSX-R defects and take adequate corrective action in a timely manner.

3. Suzuki was aware of the danger of GSX-R loss of brake pressure and failed to warn GSX-R riders of the potential for loss of brake pressure at least a year before the injuries to Derek Schall.

4. Suzuki failed to inform the National Highway Traffic and Safety Administration (NHTSA) of the complaints of brake loss pressure under the Early Warning Reporting System in a timely manner.

15

5. Suzuki failed to notify NHTSA that the GSX-R motorcycle contained a defect related to motor vehicle safety as required under 49 USC 301 and 49 CFR 573 in a timely manner.

6. Suzuki was aware that replacement of the master cylinder piston and repositioning the reservoir port would correct the defective and unreasonably dangerous master cylinder system, yet failed to make such correction to substantially reduce or eliminate the risk of injury in a timely manner.

7. Suzuki failed to identify foreseeable conditions of use and instead blamed riders for not conducting a pre-operation check.

8. Suzuki acted with a clear, conscious and willful disregard for the safety of GSX-R riders, and contrary to their own code of conduct put their own economic interests over the safety of their customers.

### *Suzuki Motorcycles -- Federal Standards and Guidelines*

**Suzuki Next 100**
**June 30, 2015**

- Mission statement -- Develop products of superior value by focusing on the customer
- Top Priority on Quality -- Safety and reliance of customers is the top priority
- Customer -- focused -- Take action with customer -- focused mind in all aspects in line with the spirit of the mission statement
- Mission statement established in 1962