# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## OWENSBORO DIVISION

CIVIL ACTION NO: 4:14-CV-00074-JHM

DEREK SCHALL                                                              PLAINTIFF

V.

SUZUKI MOTOR OF AMERICA, INC.,
SUZUKI MOTOR CORP., and
NISSIN KOGYO CO., LTD.                                          DEFENDANTS

## <u>Memorandum Opinion and Order</u>

This matter is before the Court on Defendants Suzuki Motor of America, Inc. ("SMAI") and

Suzuki Motor Corporation's ("SMC") Motion to Exclude Plaintiff Derek Schall's expert witness,

Jeffrey Hyatt.  [DN 187].  Fully briefed, this matter is ripe for decision.

## I.     Background

Schall was injured in a motorcycle accident on July 19, 2013, in Daviess County, Kentucky.

[DN 5 ¶ 39].  He alleges that the accident was caused by defects in the front brake master cylinder on

the motorcycle, a 2007 Suzuki GSX-R600.  [*Id.*].  He sued SMC, the manufacturer of the motorcycle;

SMAI, the importer of the motorcycle; and Nissin Kogyo Co., Ltd., the manufacturer of the brake

master cylinder, alleging strict products liability and negligence.  [*Id.* ¶¶ 41–52].

## II.     Standard of Review

Federal Rule of Evidence 702 provides that "[a] witness who is qualified as an expert by

knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise

if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to

understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts

or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has

reliably applied the principles and methods to the facts of the case."  Under Rule 702, the trial judge

acts as a gatekeeper to ensure that expert evidence is both reliable and relevant. *Mike's Train House, Inc. v. Lionel, LLC*, 472 F.3d 398, 407 (6th Cir. 2006) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999)).

> Parsing the language of the Rule, it is evident that a proposed expert's opinion is admissible, at the discretion of the trial court, if the opinion satisfies three requirements. First, the witness must be qualified by "knowledge, skill, experience, training, or education." FED. R. EVID. 702. Second, the testimony must be relevant, meaning that it "will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* Third, the testimony must be reliable. *Id.*

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008). "Rule 702 guides the trial court by providing general standards to assess reliability." *Id.*

In determining whether testimony is reliable, the Court's focus "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 595 (1993). The Supreme Court identified a non-exhaustive list of factors that may help the Court in assessing the reliability of a proposed expert's opinion. These factors include: (1) whether a theory or technique can be or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether the technique has a known or potential rate of error; and (4) whether the theory or technique enjoys "general acceptance" within a "relevant scientific community." *Id.* at 592–94. This gatekeeping role is not limited to expert testimony based on scientific knowledge, but instead extends to "all 'scientific,' 'technical,' or 'other specialized' matters" within the scope of Rule 702. *Kumho Tire*, 526 U.S. at 147. Whether the Court applies these factors to assess the reliability of an expert's testimony "depend[s] on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Id.* at 150 (quotation omitted). Any weakness in the underlying factual basis bears on the weight, as opposed to admissibility, of the evidence. *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 530 (citation omitted). *See also Brooks v. Caterpillar Glob. Mining Am., LLC*, No. 4:14CV-00022-JHM, 2017 WL 5633216, at *1–2 (W.D. Ky. Nov. 22, 2017).

# III. DISCUSSION

Schall retained Hyatt as a forensic engineer to examine Schall's brake master cylinder. [DN 240 at 4]. Defendants now request that the Court exclude Hyatt's testimony based on his opinions in four areas: "(1) corrosion, (2) design defect, (3) testing conducted in *Winckler v. Suzuki Motor Corporation et al.*, and (4) Suzuki's corporate knowledge or awareness." [DN 240 at 8]. The Court will address each challenge in turn.

## A. Corrosion

### 1. Qualifications

Defendants argue that "Hyatt is not qualified to offer corrosion opinions." [DN 187 at 4]. They say that Hyatt "admittedly does not have expertise in chemistry, metallurgy, materials science or materials engineering." [*Id.*]. They also say that Hyatt "has never authored any papers on corrosion." [*Id.*]. In essence, Defendants assert that Hyatt's "expertise in testing products and materials, combined with his 'general understanding' of galvanic corrosion does not qualify him as an expert in corrosion." [*Id.* at 5].

To offer his expert opinions on corrosion, Hyatt must be qualified based on his "knowledge, skill, experience, training, or education." FED. R. EVID. 702. "[T]o be qualified as an expert witness under Rule 702, an expert need not be a blue-ribbon practitioner with optimal qualifications or have an intimate level of familiarity with every component of a product as a prerequisite to offering expert testimony." *Jackson v. E-Z-GO Div. of Textron, Inc.*, 326 F. Supp. 3d 375, 387–88 (W.D. Ky 2018) (citation and internal quotation marks omitted). "In other words, experts need not even have direct experience with the precise subject matter or product at issue." *Id.* at 388 (citation and internal quotation marks omitted). Furthermore, "an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation" as long as "the expert's

opinion will have a reliable basis in the knowledge and experience of his discipline." *Daubert*, 509 U.S. at 592.

Hyatt is qualified to offer expert opinions in this matter. Hyatt has been employed at Applied Technical Services, Inc. ("ATS") since 1996. [DN 240-7 at 1]. His experience at ATS includes "[i]nvestigation and analysis of failures involving all major systems of automobiles, light trucks and heavy trucks, including seatbelts, airbags, hydraulic brakes, air brakes, engines, transmissions, vehicle computer systems, anti-lock brakes, tire failures, axle and wheel separations, door latch and hinge integrity, locks and security systems." [*Id.*]. Hyatt obtained a Bachelor of Science in Mechanical Engineering Technology. [*Id.*]. Hyatt does not have his engineering license nor is he a metallurgist, materials scientist, or materials engineer. [DN 240-9 Hyatt Dep. 9:3–6, 123:13–19]. He also has not published any papers on corrosion. [*Id.* at 123:10–12]. However, his over 30 years of vehicle hydraulic brake experience coupled with his reliance on a metallurgist at ATS to identify that there was zinc corrosion on the brake master cylinder is sufficient to qualify him as an expert to give limited opinions about corrosion. [DN 240-8 at 9, DN 240-9 Hyatt Dep. 13:14–17]. Hyatt has described his work in determining how contaminants get into the brake system as having to rely on others to tell him what the contaminant is, and then he relies on his testing or their knowledge to determine what the effect might be. [DN 187-9 *Soulliere* Hearing 57:13–24]. His corrosion opinions are based on his observations of the material, analysis of the material, and his experience with other pistons that he has examined in other cases. [DN 240-9 Hyatt Dep. 64:24–65:5]. Given Hyatt's education and experience, he is qualified to offer his opinions about corrosion. *See* FED. R. EVID. 702(a) (an expert may be qualified by "knowledge, skill, experience, training, or education."). In his reports, Hyatt did not testify regarding how galvanic corrosion occurs or the science behind corrosion. Thus, in as much as Schall might attempt to elicit such testimony at trial from Hyatt, such testimony will not be permitted.

### 2. Reliable Basis

Defendants also argue that Hyatt's corrosion opinion is unreliable because "he examined the piston more than three years after the accident when the piston's condition had clearly changed." [DN 187 at 7]. Defendants assert that "[b]etween the initial inspection of the spring and piston in April 2014 and the time those components were received by Mr. Hyatt in January 2016, they were in the possession and control of agents of [Schall]—i.e., [Schall's] experts and/or attorneys—and the conditions of their storage are unknown to Suzuki." [*Id.*]. Defendants additionally note that "[w]hat Mr. Hyatt ignores is the fact that the white crust like substance that he observed on the piston in November 2016 was not present on the piston when it was disassembled at the joint inspection on April 14, 2014." [*Id.* at 8].

"[M]ere weaknesses in the factual basis of an expert witness' opinion . . . bear on the weight of the evidence rather than on its admissibility." *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 801 (6th Cir. 2000). The weaknesses identified by Defendants bear on the weight of Hyatt's opinions and not on their admissibility. Hyatt's corrosion opinions are reliable because Hyatt inspected the component parts that were delivered to his lab. [DN 240-8 at 3]. He had the corrosive material tested by a metallurgist at his lab. [DN 240-9 Hyatt Dep. 13:14–21]. His corrosion opinions are based on his observations, analysis, and his experience with other pistons that he has examined in other cases. [*Id.* at 64:24–65:5]. Therefore, Hyatt's corrosion opinions are reliable.

### B. Defect Design

#### 1. Qualifications

Defendants argue that Hyatt is not qualified to opine regarding the design of the brake master cylinder because he "is not a metallurgist, materials science expert, chemist or automotive design engineer." [DN 187 at 11]. They also assert that Hyatt "has never designed a motorcycle, a motorcycle brake system, a brake system master cylinder or any part of a brake system for any

vehicle." [*Id.*]. Defendants say that Hyatt's "only experience as an expert with motorcycle brake issues has been his work on Suzuki front brake master cylinder cases." [*Id.* at 11–12].

As discussed previously, an expert need not have direct experience with the product at issue. *Jackson*, 326 F. Supp. 3d at 387–88. So, the Court does not find Defendants' argument about Hyatt's lack of experience with designing motorcycles or motorcycle brake systems persuasive. "The federal courts in a number of product liability cases involving engineering experts have permitted an expert witness with general knowledge to give expert testimony where the subject of that testimony related to such general knowledge but the expert had no specialized knowledge of the particular product." *Burke ex rel. Burke v. U-Haul Int'l, Inc.*, No. 3:03CV-32-H, 2006 WL 3043421, at *4 (W.D. Ky. Oct. 20, 2006) (permitting an expert qualified in vehicle dynamics to opine how a tow dolly reacted to an accident, even though the expert had no particular experience with tow dollies); *Palatka v. Savage Arms, Inc.*, 535 F. App'x 448, 455 (6th Cir. 2013) ("[W]e will not require [an expert] to have a specialized knowledge of firearms to offer opinions" in a firearm design and manufacturing defect case where the expert had "skill, education, and training in mechanical engineering."). The Court considers a proposed expert's "full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000); *see also Brooks, LLC*, 2016 WL 276126, at *3 (same).

As discussed previously, Hyatt has over thirty years of hydraulic brake experience. [DN 240-8 at 9]. He does not need experience directly with the brake master cylinder at issue to opine about its design. Even so, he has worked as an expert with motorcycle brake issues on other Suzuki brake master cylinder cases. [*Id.* at 11]. In his time at ATS, he has conducted investigations and analysis of failures such as hydraulic brakes. [DN 240-7 at 1]. Hyatt's experience is coupled with his degree

in Mechanical Engineering Technology. [*Id.*]. Thus, Hyatt's education and experience qualifies him to offer opinions about the design of the brake master cylinder.

### 2. Relevance

Defendants argue that Hyatt's design defect opinions are not relevant to the facts of the case. [DN 187 at 15]. Defendants say, "[w]hile Mr. Hyatt himself does not offer any opinion about the cause of [Schall's] crash, [Schall] presumably seeks to offer his design defect opinions to support the theory that [Schall's] degraded brake fluid caused the piston to corrode, which in turn generated hydrogen gas, which in turn caused a loss of brake pressure." [*Id.*]. Defendants conclude that "[w]ithout any evidence linking his abstract design defect opinion to the facts of this case, his opinion is irrelevant . . . ." [*Id.* at 17].

In a products liability case, "[n]egligence and strict liability theories of recovery overlap to the degree that, in either instance, the plaintiff must prove the product was defective and the legal cause of the injury." *Shea v. Bombardier Recreational Prods., Inc.*, No. 2011-CA-000999-MR, 2012 WL 4839527, at *4 (Ky. Ct. App. 2012) (citing *Tipton v. Michelin Tire Co.*, 101 F.3d 1145, 1150 (6th Cir. 1996)). *See also Hinken v. Sears Roebuck & Co.*, No. 13CV-283-HRW, 2015 WL 165027, at *3 (E.D. Ky. Jan. 13, 2015); *Yonts v. Easton Tech. Prods., Inc.*, No. 3:11-CV-535-DJH, 2015 WL 3408937, at *5 (W.D. Ky. May 27, 2015). "The ultimate question is whether the product creates 'such a risk' of an accident of the general nature of the one in question 'that an ordinarily prudent company engaged in the manufacture' of such a product 'would not have put it on the market.'" *Yonts*, 2015 WL 3408937, at *5 (quoting *Montgomery Elevator Co. v. McCullough by McCullough*, 676 S.W.2d 776, 780, 782 (Ky. 1984)).

Hyatt testified that the design defect is the use of two dissimilar metals, in direct contact with each other, in the brake master cylinder. [DN 240-9 Hyatt Dep. 51:1–18]. He opined that the brake master cylinder "was defective due to its inability to self-bleed and the fact that use of the zinc piston

7

in this manner caused it to be unusually sensitive to corrosion attack." [DN 240-8 at 11]. Furthermore, he said, "in my 30 plus years of vehicle hydraulic brake experience I had [*sic*] never encountered zinc as a material used internally on hydraulic brake systems." [*Id.* at 9]. The Court finds that Hyatt's opinion is relevant to determining whether the brake master cylinder was defectively designed or had a manufacturing defect.

### 3. Reliability

For similar reasons discussed above, Defendants argue that Hyatt's design defect opinions are not reliably applied to the facts of this case. [DN 187 at 15]. Defendants say, "[t]here is no evidence that there was hydrogen gas in [Schall's] front brake master cylinder at the time of the crash or nine months later when the master cylinder was disassembled at the April 14, 2014 inspection." [*Id.*]. They contend that "[t]he sudden, complete loss of all brake pressure at the time of the crash that [Schall] described in his deposition is inconsistent with the gradual loss of brake pressure that can occur under the recall condition, namely that gas slowly builds up over time due to corrosion." [*Id.*].

There is evidence linking Hyatt's opinion to the facts. Hyatt's opinion concerning the corrosion of the zinc piston was based on his testing and observations as discussed previously. He tested top feed master cylinders and discovered that they do not trap gas, unlike his testing of the brake master cylinder at issue here which is not a top feed brake master cylinder. [DN 240-8 at 11]. He reviewed Suzuki documents that led him to the opinion that Suzuki was aware of the defect and replaced the brake master cylinder with a design that included a top feed master cylinder when the recall occurred. [*Id.*]. He also noted that in his experience he had never seen zinc used as a material internally on a hydraulic brake system. [DN 240-8 at 9]. Additionally, in his supplemental report, Hyatt offers the opinion that "[t]he Suzuki test data and the evaluation of the [Brembo] products demonstrated that the aluminum piston would have been more corrosion resistant, and was an effective and feasible alternative design that pre-dated the manufacture of the subject master cylinder

in this case." [DN 240-10 at 5]. This opinion was based on Hyatt's reading of a Suzuki report and purchasing and examining a piston manufactured by the Brembo company. [*Id.* at 2–4]. Again, in addition to reviewing Suzuki documents, he examined the Brembo product considering his training and experience. [DN 240-10 at 5]. As such, Hyatt's opinions are reliable. To the extent that Schall uses Hyatt's opinion to support Schall's theory of causation, Defendants will have the opportunity at trial to challenge Hyatt's opinion in relation to the circumstances of Schall's accident and their own theory of causation.

**C. Testing Conducted in *Winckler v. Suzuki Motor Corp. et al.***

**1. Gas Entrainment and Self-Bleeding Test**

Defendants assert that Hyatt's "'Gas Entrainment and Self-Bleeding Test' did not use a scientifically valid methodology." [DN 187 at 18]. They further argue that Hyatt's testing is not reliable under any of the non-exclusive factors listed in *Daubert*. [*Id.* at 19]. The "Gas Entrainment and Self-Bleeding Test" took place in *Winckler v. Suzuki Motor Corp. et al.* The testing involved equipment with identical performance specifications to Schall's motorcycle. [DN 240-9 Hyatt Dep. 45:14–46:9]. The purpose of the test was to evaluate the pre-recall brake master cylinder and the post-recall brake master cylinder's ability to purge air from the system. [*Id.* at 46:11–47:1]. To conduct the test, Hyatt installed an exemplar 2006 brake master cylinder on an exemplar GSX-R1000. [DN 240-8 at 6]. "The brake system was bled of all entrained gases." [*Id.*]. The 2006 brake master cylinder exemplar had a side fluid entry port, which was the type that Suzuki recalled. [*Id.*]. Hyatt measured the brake lever forces. [*Id.* at 7]. Hyatt then forced air back through the bleeder screw until air freely bubbled into the master cylinder reservoir. [*Id.*]. "The bleeder screw was resealed and the brake lever cycled back and forth operating the master cylinder until bubbles were no longer observed by way of the reservoir." [*Id.*]. Hyatt then measured the brake lever force again. [*Id.*]. Hyatt also obtained from Suzuki the replacement brake master cylinder used in the recall. [*Id.*]. The fluid entry

port on the replacement brake master cylinder was on the top. [*Id.* at 8]. Hyatt concluded that "these top feed entry master cylinders were not susceptible to gas entrainment brake loss like the subject 2006 side entry master cylinder was." [*Id.* at 11].

Defendants maintain that "[t]here is no proof that his methodology can or has been tested, has been subject to peer review or publication, or has been accepted by any relevant scientific or technical community." [DN 187 at 19]. They also say, "[t]he test cannot be accurately replicated because he did not measure the amount of gas pumped into the brake line—he merely eyeballed 'aggressive bubbling' in the reservoir." [*Id.*]. Defendants also argue that the test "was devised solely for purposes of litigation, and the purported results are inconsistent with the results of the dynamic brake function testing he conducted in *Stubblefield* [*v. Suzuki Motor Corp.*]." [*Id.* at 21].

While there is no evidence that Hyatt's methodology has been tested in the past, Hyatt was thorough in his description so that the methodology can be tested and replicated. [DN 240-8 at 6–8]. There is also no evidence that the methodology has been subject to peer review or publication or has been accepted by the scientific community. But as Defendants aptly point out, the *Daubert* factors are non-exclusive. [DN 187 at 19]. Contrary to Defendants' assertion that Hyatt's testing was litigation driven, he describes in his report that the methodology he followed "is of the kind that is usually and customarily followed by reconstructionist and vehicle investigators," is "the same kind [he] would follow for any client who asks for a forensic analysis," and is "the same analytical procedure [he has] used in [the] industry, and that [he] would use to evaluate a product's design . . . ." [DN 240-8 at 3]. Additionally, the nature of Hyatt's work is "specialized testing . . . for clients" because it is an "independent test facility." [DN 240-8 at 2].

In *Stubblefield*, Hyatt conducted testing on a 2006 Suzuki GSX-R1000 with a side port. [DN 187-16 at 2–3]. In that testing, a professional motorcyclist rode the motorcycle and aggressively stopped it while traveling at designated speeds. [*Id.* at 8]. The speed and stopping distances were

recorded. [*Id.*]. In his report, Hyatt said, "during the testing above, it was observed that with each additional application of the brakes there was an improvement of the brakes [*sic*] performance." [*Id.* at 9]. Defendants conclude that in contrast to the "Gas Entrainment and Self-Bleeding" test in *Winckler*, the *Stubblefield* test shows a brake master cylinder with "significantly improved braking function after only a few brake applications." [DN 187 at 20]. As a result, Defendants argue that Hyatt's "own testing demonstrates that his static brake testing method is unreliable in determining whether a side port is effective in purging gas while being ridden." [*Id.*]. The results of the *Stubblefield* test do not show that the *Winckler* test is unreliable. The *Stubblefield* testing focused on "testing and evaluation of the motorcycle under operational conditions." [DN 187-16 at 3]. Hyatt described the *Stubblefield* test as "functional testing of exhibit motorcycle brakes," whereas the *Winckler* test was used to "determine the ability of the original master cylinder design to self-bleed when gases become trapped in the master cylinder bore." [DN 240-8 at 6, DN 187-16 at 5]. These tests appear to have different purposes, but any inconsistency goes to the weight of Hyatt's opinion and not its admissibility.

### 2. Ride Testing of Front Brakes

In another test conducted in the *Winckler* case, the purpose was to calculate certain stopping distances relevant in *Winckler*. [DN 187-17 at 2]. In this test, Hyatt had a professional motorcycle rider perform test runs on an exemplar 2008 Suzuki GSX-R1000 motorcycle. [DN 240-9 Hyatt Dep. 95:10–15, DN 187-17 at 2]. In a letter to Schall's attorney, Hyatt says, "a secondary effect of this testing was that it demonstrated that a rider could easily have only 50% of their brakes [*sic*] capacity and the motorcycle would not exhibit any apparent deficiency in a low speed (less than 5 mph) brake test, but at higher speeds (greater than 25 mph) this same condition would result in nearly double the stopping distance when compared to a normal functioning brake system." [DN 187-17 at 2]. Hyatt says that this testing supports that Schall had gas in his master cylinder:

The gas resulted perhaps in reduced braking. It might explain how you might not understand that you have reduced braking if you did a stop check or a quick check, it would explain that it might not be detectable to a rider unless they had a good understanding of the difference in the feel of the brake lever.

[DN 240-9 Hyatt Dep. 92:21–93:7].

Defendants argue that Hyatt's testimony about the test should be excluded for three reasons: "(1) the ostensible conclusions are immaterial to any issue in this case, (2) the test protocol allows undetected and undocumented variability in the process and results, and (3) he is not an expert in human factors or motorcycle riding and is not qualified to give opinions regarding how a rider might perceive the effectiveness of his brakes' performance." [DN 187 at 21].

First, the Court disagrees with Defendants that the testimony is immaterial. [*Id.* at 23]. As discussed previously, in a products liability case, "[n]egligence and strict liability theories of recovery overlap to the degree that, in either instance, the plaintiff must prove the product was defective and the legal cause of the injury." *Shea*, 2012 WL 4839527, at *4. Whether a rider's brakes would exhibit any apparent deficiency at certain speeds is relevant for the jury to determine causation here.

Furthermore, Hyatt did not admit that "the notion that Plaintiff experienced a loss of brake pressure due to gas in the brake system is merely a theory" as Defendants assert. [DN 187 at 23]. Hyatt's opinion is not speculative because it is supported by the record. Hyatt explained that "ATS testing has demonstrated that a Suzuki GSX-R with approximately 50% gas inside the recalled master cylinder can stop abruptly enough at speeds less than 5 mph to be able to cause the rear wheel to come off the ground. However, that same motorcycle at speeds of 25–28 mph will only develop about half its braking capacity due to the presence of gas and cannot lock its brake at high speed." [DN 187-17 at 2].

Second, Defendants' assertion that Hyatt's testing "protocol allows undetected and undocumented variability in the process and results" does not make Hyatt's testing unreliable. [DN 187 at 21]. The only record of how firmly the rider squeezed the brake lever in any of the test runs is

what was captured on video. [DN 240-9 Hyatt Dep. 99:24–100:3]. Hyatt documented the speeds and the stopping distances and calculated the deceleration rate from his testing. [*Id.* at 102:4–7]. However, Defendants complain that "there was no mechanism to document or measure the amount of brake force applied" during the testing. [DN 187 at 26]. Even with this weakness in the documented testing conditions, Hyatt did adequately document his testing conditions when he recorded the test on video, and documented the speeds and stopping distances, which makes his testing reliable. *See Smelser v. Norfolk Southern Ry. Co.*, 105 F.3d 299, 304 (6th Cir. 1997), *abrogated on other grounds by Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500 (6th Cir. 1998) (finding that expert's opinion could not be based on good science when, among other things, the expert "failed to adequately document testing conditions and the rate of error so the test could be repeated and its results verified and critiqued").

Third, Defendants assert that Hyatt is not an expert in human factors, so he is not qualified to give his opinion. [DN 187 at 26]. While Hyatt is not a human factors expert or a motorcycle riding expert, his opinion merely explains whether diminished braking capacity is noticeable at certain speeds. [DN 187-17 at 2]. His testimony is based on testing that shows stopping distances of a motorcycle at various speeds, which is not a human factors or motorcycle riding expert opinion.

**D. Corporate Knowledge or Awareness**

Finally, Defendants argue that Hyatt's opinion regarding Suzuki's knowledge or awareness should be excluded. [DN 187 at 27]. They contend that Hyatt's conclusions about what Suzuki was aware of and its state of mind are "based simply on his review of documents produced by Suzuki rather than on any expert analysis of evidence." [*Id.*].

"Courts have typically barred expert opinions or testimony concerning a corporation's state of mind, subjective motivation, or intent. In general, courts have found that this type of 'testimony is improper . . . because it describes 'lay matters which a jury is capable of understanding and deciding

without the expert's help.'" *In re E.I. du Pont Nemours & Co. C-8 Pers. Injury Litig.*, 348 F. Supp. 3d 698, 718 (S.D. Ohio 2016) (citations omitted); *see In re Heparin Prod. Liab. Litig.*, MDL No. 1953, 2011 WL 1059660, at *6, *8 (N.D. Ohio Mar. 21, 2011) (finding that an expert could not testify about the "knowledge, motivations, intent or purposes of Defendants or their employees" nor could an expert "testify concerning the state of mind, intent, knowledge, purposes, or motivations of Defendants, its employees, or the FDA").

Hyatt opines that "Suzuki was aware of the self[-bleeding] defect with the 2007 master cylinder as early as June 2012 but waited until October 2013 to issue a recall of this design and offer a replacement upgrade to the top feed master cylinder." [DN 240-8 at 11]. Hyatt also opines that "[e]vidence indicated that Suzuki was aware of the susceptibility of the subject GSX-R master cylinder to corrosion attack as early as April 2013." [1] [*Id.*]. He further states that a top feed master cylinder "would have allowed any corrosion gases produced in the master cylinder to escape and not cause reduced braking." [*Id.*]. He relies on a report that indicated that Suzuki and Nissin were "aware that the zinc piston inside the subject type master cylinder [was] suffering the buildup of solid zinc residues . . . ." [*Id.*].

Hyatt based his opinions on ATS research data, testing on the subject motorcycle components, previous testing of GSX-R front brakes in four other investigations, corporate reports, and historical documents regarding the brake system design and materials. [*Id.* at 3]. Based on his engineering background and his review of the data and evidence, Hyatt can opine about what Defendants were aware of and when they were aware of it, which will assist a jury in understanding whether Defendants' actions were reasonable. *In re Yamaha Motor Corp. Rhino ATV Prods. Litig.*, 816 F. Supp. 2d 442, 459 (W.D. Ky. 2011) (permitting expert testimony regarding "what Yamaha knew

---

[1] Hyatt later says in the report that "[r]eview of the Suzuki and Nissin Kogyo documents have led me to conclude that Suzuki and Nissin Kogyo were aware of the susceptibility of the subject GSX-R master cylinder to corrosion attack as early as April 2009." [DN 240-8 at 11–12].

and when"); *see also Tillman v. C.R. Bard, Inc.*, 96 F. Supp. 3d 1307, 1333 (M.D. Fla. 2015) ("[T]o the extent [an expert] merely discusses what information was available and possessed by [the defendant] prior to [the] procedure, this testimony is helpful and relevant to determining whether [the defendant] acted reasonably and does not improperly comment on [the defendant's] 'state of mind.'").

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion to Exclude the testimony of Hyatt [DN 187] is **DENIED**.

Joseph H. McKinley Jr., Senior Judge
United States District Court

March 27, 2020

cc: counsel of record