# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### OWENSBORO DIVISION

**CIVIL ACTION NO: 4:14-CV-00074-JHM**

**DEREK SCHALL**                                                     **PLAINTIFF**

**V.**

**SUZUKI MOTOR OF AMERICA, INC.,**
**SUZUKI MOTOR CORP., and**
**NISSIN KOGYO CO., LTD.**                                       **DEFENDANTS**

### Memorandum Opinion and Order

This matter is before the Court on Defendant Suzuki Motor of America, Inc.'s Motion For Summary Judgment. [DN 206]. Fully briefed, this matter is ripe for decision.

## I.    Background

Plaintiff Derek Schall was injured in a motorcycle accident on July 19, 2013, in Daviess County, Kentucky. [DN 5 ¶ 39]. He alleges that the accident was caused by defects in the front brake master cylinder on the motorcycle, a 2007 Suzuki GSX-R600. [*Id.*]. The motorcycle involved in the incident was manufactured by Suzuki Motor Corp. ("Suzuki") and was sold by American Suzuki Motor Corp. ("ASMC"), a wholly-owned American subsidiary of Suzuki. From 1986 through April 1, 2013, Suzuki operated in America through ASMC.

On October 31, 2012, Suzuki formed Suzuki Motor of American, Inc. ("SMAI"), a new wholly-owned subsidiary of Suzuki. SMAI Senior Engineer Alexander Butt testified that SMAI was formed for the sole purpose of acquiring ASMC's assets. [DN 221, Butt Dep. at 14]. On November 5, 2012, ASMC filed Chapter 11 bankruptcy. A day after the bankruptcy was filed, ASMC and SMAI executed an Asset Purchase Agreement. On March 15, 2013, the United States Bankruptcy Court of the Central District of California entered an Order Confirming Debtor's Fifth Amended Plan of Liquidation Under Chapter 11 of the Bankruptcy Code ("Bankruptcy Court

Order").  As part of the Bankruptcy Plan, some of ASMC's assets—Suzuki's motorcycle, marine, and ATV business operations—were purchased by SMAI.

The Defendants filed multiple motions for summary judgment.  In addition to a joint motion with Suzuki, SMAI filed a separate motion for summary judgment arguing that it is independently entitled to summary judgment because SMAI was not in existence at the time the motorcycle was manufactured, SMAI does not have successor liability for this suit, and Kentucky's Middleman Statute bars Schall's claims.  The Court addresses these arguments in turn.

## II.  STANDARD OF REVIEW

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U .S. 242, 247–48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]"  Fed. R. Civ. P. 56(c)(1).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  *Anderson*, 477 U.S. at 252.

# III.    Discussion

## A. Asset Purchase Agreement and Successor Liability

Schall brings a product liability action against SMAI under the Kentucky Product Liability Act.  KRS § 411.300.  "To recover under any product liability claim, the plaintiff must prove the existence of a 'defect' and legal causation."  *Prather v. Abbott Labs.*, 960 F. Supp. 2d 700, 706 (W.D. Ky. 2013) (internal citations omitted).  SMAI argues that in the present case it is impossible for Schall to prove legal causation because SMAI did not manufacture, construct, design, formulate, develop standards, prepare, process, assemble, test, list, certify, warn, instruct, market, advertise, package, or label the subject Suzuki motorcycle.  In fact, SMAI argues that it did not and could not have any involvement with the 2007 Suzuki GSX-R600 motorcycle as it did not incorporate until October 31, 2012, or begin business operations until April 1, 2013.  According to SMAI, because it had no involvement in the distribution chain through which the subject motorcycle came into Schall's possession, Schall cannot, as a matter of law, show that SMAI caused his injuries.  In response, Schall argues that the Court should deny SMAI's motion based on the plain language of the Asset Purchase Agreement between SMAI and ASMC where SMAI expressly assumed liability for his claims.

### 1.  Law

Accordingly, the first issue raised in SMAI's motion for summary judgment is governed by the principles of contract interpretation.    The interpretation of a contract is a question of law for the Court to decide.  *Kemper Nat. Ins. Cos. v. Heaven Hill Distilleries, Inc.*, 82 S.W.3d 869, 871 (Ky. 2002); *Hulda Schoening Family Trust v. Powertel/Kentucky Inc.*, 275 F. Supp. 2d 793, 794 (W.D. Ky. 2003); *W. Heritage Ins. Co. v. Frances Todd, Inc.*, 245 Cal. Rptr. 3d 552, 557 (Ca. Ct. App. 2019).  "In construing a contract, a court's primary objective is to ascertain and to effectuate the intention of the parties to the contract from the contract itself."  *Logan Fabricom,*

*Inc. v. AOP P'ship LLP*, No. 2004-CA-002410-MR, 2006 WL 3759412, *2 (Ky. Ct. App. Dec. 22, 2006). A court's analysis thus begins with a contract's four corners. *See 3D Enters. Contracting Corp. v. Louisville & Jefferson Cnty. Metro. Sewer Dist.*, 174 S.W.3d 440 (Ky. 2005) (noting that when no ambiguity in a contract exists, a court should look "only as far as the four corners of the document to determine the parties' intentions"). As a rule, a contract "must be construed as a whole, giving effect to all parts and every word in it if possible." *Am. Dairy Queen Corp. v. Fortune Street Research and Writing Inc.*, 753 F. Supp. 2d 675, 679 (W.D. Ky. 2010).

"[I]n the absence of ambiguity, a written instrument will be enforced strictly according to its terms, and a court will interpret the contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence." *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003) (quotation and citation omitted). If a contract is ambiguous, however, a court may "consider parol and extrinsic evidence involving the circumstances surrounding execution of the contract, the subject matter of the contract, the objects to be accomplished, and the conduct of the parties[.]" *Wolf River Oil Co. v. Equity Grp.-Ky. Div., LLC*, No. 1:09-CV-00030, 2010 WL 427775, at *2 (W.D. Ky. Feb. 3, 2010) (quoting *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. Ct. App. 2002)).

The fact that the parties disagree about a contract's interpretation does not mean that it is ambiguous. *See B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 594 (6th Cir. 2001) (noting that "disputed issues of contractual interpretation can be resolved at summary judgment on the basis that they are questions of law"); *see also Cantrell Supply, Inc.*, 94 S.W.3d at 385 (stating that "[t]he fact that one party may have intended different results . . . is insufficient to construe a contract at variance with its plain and unambiguous terms"). Instead, a contract is ambiguous only "if it can be reasonably interpreted to support two different positions." *Albert M. Higley Co. v. N/S Corp.*, 445 F.3d 861, 865 (6th Cir. 2006); s*ee also Thee Sombrero, Inc. v. Scottsdale Ins. Co.*, 239

Cal. Rptr. 3d 416, 421 (Ca. Ct. App. 2018) (California law is consistent with Kentucky law on contract interpretation).[1]  Once a court determines that a contract is ambiguous, "areas of dispute concerning the extrinsic evidence are factual issues" and contract construction becomes "subject to resolution by the fact-finder."  *Rite Aid of Ky., Inc. v. Foursome Props., LLC*, No. 2010-CA-001199, 2011 WL 3516851, at *2 (Ky. Ct. App. Aug. 12, 2011); s*ee also ADA-ES, Inc. v. Big Rivers Elec. Corp.*, No. 4:18-CV-00016-JHM, 2019 WL 332412, at *4–5 (W.D. Ky. Jan. 25, 2019).

### 2. Contract

On November 6, 2012, ASMC and SMAI executed an Asset Purchase Agreement in which SMAI purchased certain assets and assumed certain liabilities of ASMC.  In the background, or Recitals, to the Asset Purchase Agreement, ASMC is described as engaged in the following distinct business lines in the United States Territory:

> (i) the distribution and sale of Suzuki Automotive Products (such business line, the "***Autosales Business***"), (ii) the servicing of Suzuki Automobiles, including any warranty work, and the sale of parts in connection with such servicing (such business line, the "***Auto Servicing Business***"), (iii) the distribution, sale and servicing of Suzuki Motorcycle Products and Suzuki ATV Products (such businesses, collectively, the "***Motorcycle/ATV Business***"), and (iv) the distribution, sale and servicing of Suzuki Marine Products (such business, the "***Marine Business***").

[DN 221-1, Exhibit A, Asset Purchase Agreement, RECITALS, at § B(i)–(iv)].   The Asset Purchase Agreement further provides that in this Agreement, "the Auto Servicing Business, the Motorcycle/ATV Business and the Marine Business collectively are referred to as the '***Acquired Business***.'"  [*Id*. at § B(c)].

---

[1] The Asset Purchase Agreement provides that California law controls; however, neither party utilizes California law as it relates to contract interpretation likely because California law is consistent with Kentucky law on this issue.

Significantly for purposes of this motion for summary judgment, § 2.5 of the Asset Purchase Agreement sets forth the following liabilities assumed by SMAI:

> 2.5 <u>Assumed Liabilities</u>. Effective as of the Closing Date, Purchaser [SMAI] shall assume only the following Liabilities of Seller [ASMC]: (i) all Liabilities relating to the ownership or operation of the Purchased Assets or the Acquired Business to the extent such Liabilities arise solely after the Closing Date, including any such Liabilities for real property or ad valorem Taxes applicable to the Purchased Assets, to the extent that such Liabilities arise solely after the Closing Date [and] (ii) all Suzuki Product Liability . . . .

[DN 221-1, Exhibit A, Asset Purchase Agreement at § 2.5(i)–(ii)]. In construing the meaning of the Asset Purchase Agreement, an understanding of the terms utilized by the parties in § 2.5 is necessary.

The term "Liability" is defined under the Asset Purchase Agreement as follows:

> any direct or indirect liability, [i]ndebtedness, obligation, commitment, expense, claim, deficiency, guaranty or endorsement of any type whatsoever, whether accrued or unaccrued, absolute or contingent, matured or unmatured, liquidated or unliquidated, known or unknown, asserted or unasserted, due or to become due.

[*Id*. at § 16, p. 42].

As noted above, "Acquired Business" is the Auto Servicing Business, the Motorcycle/ATV Business, and the Marine Business. [*Id*. at RECITALS, at §B(c).] The "Motorcycle/ATV Business" includes "the distribution, sale and servicing of Suzuki Motorcycle Products and Suzuki ATV products." [*Id*. at RECITALS, at § B(iii)]. "Suzuki Motorcycle Products" means "motorcycles manufactured by [Suzuki] and its Affiliates and any other parts or products related thereto." [*Id*. at §16, p. 47].

In examining the term "Suzuki Product Liability" utilized in § 2.5(ii), the definition section located in § 16 of the Asset Purchase Agreement defines it as follows:

> any Liability of Seller, regardless of whether arising before or after the Petition Date, (i) under Express Warranty Claims on any Suzuki Products; (ii) for recalls and other obligations under the NTMVSA with respect to Suzuki Products; or (iii) under any Lemon Laws with respect to Suzuki Products.

[*Id*. at § 16, p. 47]. Specifically, "Express Warranty Claims" means "a claim under a written warranty issued by Seller but, for the avoidance of doubt, excluding claims for personal injury, third party property damage, or consequential damages of any kind." [*Id*. at § 16, p. 40]. Obligations under the NTMVSA refer to those obligations arising under "the National Traffic and Motor Vehicle Safety Act, 49 U.S.C. 30101 et seq., as amended." [*Id*. at § 16, p. 43]. "Lemon Laws" are those laws such as "Magnuson-Moss Warranty Act, any similar state laws, as amended, any rules or regulations promulgated pursuant thereto, as amended." [*Id*. at § 16, p. 42]. "Suzuki Products" means "any Suzuki Automotive Products, Suzuki ATV Products, Suzuki Marine Products, and Suzuki Motorcycle Products." [*Id*. at § 16, p. 47].

Finally, under § 2.6 entitled "Excluded Liabilities," the Asset Purchase Agreement provides:

> 2.6 <u>Excluded Liabilities</u>. Notwithstanding anything to the contrary contained in this Agreement, Purchaser shall not be obligated to assume or to perform or discharge any Liability of Seller other than the Assumed Liabilities (such Liabilities not assumed by Purchaser, the "***Excluded Liabilities***"). Without limiting the foregoing, Purchaser shall not be obligated to assume or to perform or discharge, and Purchaser does not assume or perform or discharge, any of the following Liabilities: (i) any Liability of Seller that arises on or before the Closing Date and is not expressly assumed by Purchaser in writing; (ii) any Liability of Seller in respect of pre-Petition Claims against Seller, other than the Assumed Liabilities . . . ."

[*Id*. at § 2.6(i)–(ii)].

### 3. Contract Interpretation

The relevant sections of the contract addressing assumed liabilities include § 2.5(i) and § 2.5(ii) as well as the related definitions. As previously mentioned, a contract is ambiguous only "if it can be reasonably interpreted to support two different positions." *Albert M. Higley Co. v. N/S Corp.*, 445 F.3d 861, 865 (6th Cir. 2006). As a rule, conflicting clauses should be construed to harmonize with each other if harmonization can consistently and reasonably be done. 17A Am.

Jur. 2d Contracts § 384; *see Int'l Union of Op. Eng. v. J.A. Jones Constr. Co.*, 240 S.W.2d 49, 56 (Ky. 1951). In this case, reading the relevant clauses and definitions together warrants a conclusion that the contract unambiguously provides no express assumption of liabilities for Schall's product liability claims against SMAI.

First, under the Asset Purchase Agreement, SMAI assumed liability for "all Suzuki Product Liability" under § 2.5(ii). However, "Suzuki Product Liability" is narrowly defined to include Express Warranty Claims, Lemon Law claims, and "for recalls and other obligations under the NTMVSA." [DN 221-1, Exhibit A, Asset Purchase Agreement at §16, p. 47]. Schall did not plead any allegations based upon an express written warranty or Kentucky's Lemon Laws. While Schall has pled claims under the NTMVSA, Schall concedes that he did so to preserve his right to appeal. Furthermore, contrary to Schall's argument, SMAI did not assume liability for "recalls" apart from recalls related to the NTMVSA. "Under the NTMVSA" modifies both recalls and other obligations. [*Id*. at § 16, p. 47]. Thus, Schall's claims are not encompassed under this provision of the Asset Purchase Agreement.

Second, Schall misinterprets the Asset Purchase Agreement to include his claims within "all Liabilities relating to the ownership or operation of the Purchased Assets or the Acquired Business" under § 2.5(i). "Purchased Assets" are defined under § 1.1 of the Asset Purchase Agreement and essentially refer to all property owned by ASMC at the time of the purchase of the assets including any existing inventory. It is undisputed that Schall's 2007 Suzuiki GSX-R600 motorcycle was not among the assets SMAI purchased. Similarly, "Acquired Business" is defined in the Asset Purchase Agreement under Recital B, page 1, and includes "the distribution, sale and servicing of Suzuki Motorcycle Products." Schall's motorcycle was sold before SMAI agreed to the Asset Purchase Agreement, and there are no allegations that either ASMC or SMAI serviced it. The Court agrees with SMAI that since the motorcycle was not part of the business SMAI

acquired, Schall's claims related to it are not part of the "liabilities" arising from his use of the motorcycle.

Additionally, a complete reading of § 2.5(i)—all Liabilities relating to the ownership or operation of the Purchased Assets or the Acquired Business to the extent such Liabilities arise solely after the Closing Date, including any such Liabilities for real property or ad valorem Taxes applicable to the Purchased Assets—suggests that SMAI assumed liabilities for business-related matters that occurred after the closing date such as claims related to real property purchased by SMAI or taxes incurred from the purchased assets. In fact, considering the language of § 2.5(i) in light of § 2.5(ii)—which specifically references product liability claims—it is evident that § 2.5(i) does not operate to broadly assume *all* product liability claims related to ASMC's distribution, sale, and servicing of motorcycles manufactured by Suzuki and its affiliates arising after the closing date of the Asset Purchase Agreement. Instead, the Asset Purchase Agreement limits SMAI's assumption of product liability claims for ASMC's conduct to that assumed in § 2.5(ii). To interpret § 2.5 differently would result in duplication of assumed liability after the closing date as it relates to the Acquired Business and fail to harmonize the clauses at issue.

Accordingly, SMAI did not expressly assume liability for Schall's claims under the Asset Purchase Agreement. However, this finding does not mean that SMAI is entitled to summary judgment on Schall's claims against it. The Court must address SMAI's potential liability under Kentucky successor liability law.

**B. ASMC's Bankruptcy**

SMAI argues that the Bankruptcy Court Order mandates summary judgment in favor of SMAI. SMAI maintains that the Bankruptcy Court made express findings of fact and conclusions of law in support of its Order Confirming Debtor's Fifth Amended Plan which forecloses Schall's argument that SMAI is liable as the successor to ASMC. According to SMAI, the Bankruptcy

Court's finding that the "transfer of the Purchased Assets" was made "free and clear" of all successor liability arising from "Debtor's operation of its business, the Debtor's ownership, control, or use of the Purchased Assets, the sale, or the Purchaser's acquisition of the Purchased Assets . . . " supports this argument. [DN 278-1 at 18, ¶ 42]. In further support, SMAI cites to the Bankruptcy Court Order which provides in part:

> 43. <u>Sale Free and Clear Provisions – Effects of No Successor Liability as to Purchaser</u>: Notwithstanding Section 9.6 of the Plan, pursuant to Sections 363(f) and 1141(c) of the Bankruptcy Code, effective upon the closing of the Sale Transaction, all Persons are forever prohibited and enjoined from taking any action against the Purchaser based on successor liability, including commencing or continuing any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or other proceeding against the Purchaser with respect to any liens, claims, encumbrances, and interest against the Debtor or the Debtor's property.

[DN 206-2 at ¶ 43].

Additionally, SMAI points to the following facts found by the Bankruptcy Court: (1) SMAI purchased certain assets of ASMC for $65 million "without collusion, in good faith, and from arm's length bargaining positions" [DN 278-1 at ¶ 39]; (2) the sale to SMAI did not "hinder, delay, or defraud . . . creditors or . . . effectuate a statutory or common law fraudulent transfer or conveyance . . . ." [*Id*.]; (3) the sale to SMAI was for substantial, fair and reasonable consideration, was not a *de facto* merger or consolidation, and did not destroy all remedies for the debtor's creditors [*Id*. at ¶ 45]; (4) SMAI would not have agreed to the Asset Purchase Agreement if it was not free and clear of unassumed liabilities including those based on successor liability [*Id*. at ¶ 48]; and (5) SMAI is not the successor, alter ego, or continuation of ASMC [*Id*. at ¶¶ 42, 44, and 48].

SMAI argues that the plain language of the Bankruptcy Court's findings preclude another court's re-adjudication of the successor liability question raised by Schall. Furthermore, SMAI asserts that public policy and federal preemption mandate a judgment in its favor. The Court will address SMAI's arguments in turn.

### 1. Public Policy of Sections 363 and 507(a) of the Bankruptcy Code

SMAI maintains that the public policies underlying 11 U.S.C. § 363 of the Bankruptcy Code are two-fold. First, allowing tort plaintiffs to bring actions against purchasers like SMAI directly rather than seeking relief from the bankruptcy estate subverts the Bankruptcy Code's priority. *In re Trans World Airlines, Inc.*, 322 F.3d 283, 291–92 (3d Cir. 2003). SMAI contends that if Schall survives summary judgment, the policies underlying the priority scheme of 11 U.S.C. § 507(a) of the Bankruptcy Code will be frustrated because it will unfairly place Schall in a better position than other creditors who were relegated to recovering their claims through the proceeds of the sale and other assets of ASMC's estate. Second, allowing sales of estate assets free and clear of the bankrupt companies' liabilities induces higher sale prices and maximizes the value of the estate and potential recovery to creditors. *Id.* at 292–93. According to SMAI, permitting Schall to make a products liability claim chills the sales of corporate assets and discourages prospective purchasers from bidding in bankruptcy sales or results in depressed purchase prices. SMAI contends that these important public policies in favor of the "free and clear" transfer of assets in bankruptcy do not harm Schall because he can pursue recovery on his product liability claims from the manufacturer.

SMAI correctly articulates the public policy considerations underlying 11 U.S.C. § 363 of the Bankruptcy Code. However, even in light of the public policy considerations recognized by the courts, a bankruptcy court's power is limited. "Bankruptcy courts have the power to approve sales of assets free and clear of any interest that could be brought against the bankruptcy estate during bankruptcy, either through 11 U.S.C. § 363(f) or the bankruptcy court's equitable powers." *In re AutoStyle Plastics, Inc.*, 227 B.R. 797, 800 (Bankr. W.D. Mich. 1998). "However, a sale free and clear does not include future claims that do not arise until after the conclusion of the bankruptcy

proceeding." *Id.* (citing *Ninth Ave. Remedial Grp. v. Allis–Chalmers Corp.*, 195 B.R. 716, 732 (N.D. Ind. 1996)).

Notably, this result is consistent with decisions by other courts holding that a non-debtor plaintiff's successor liability claim against the debtor's asset purchaser is not extinguished by a § 363 sale where the plaintiff did not receive constitutionally adequate notice. *See In re Savage Indus., Inc.*, 43 F.3d 714, 720 (1st Cir. 1994) ("Notice is the cornerstone underpinning bankruptcy code procedure . . . . Under the Code . . . the debtor in possession or trustee must ensure 'parties in interest' adequate notice and opportunity to be heard before their interests may be adversely affected."); *see also Schwinn Cycling & Fitness Inc. v. Benonis*, 217 B.R. 790, 796-97 (N.D. Ill. 1997); *In re Fairchild Aircraft Corp.*, 184 B.R. 910, 927-29 (Bankr. W.D. Tex. 1995), *vacated as moot on equitable grounds*, 220 B.R. 909 (Bankr. W.D. Tex. 1998); *In re Grumman Olson Indus., Inc.*, 467 B.R. 694, 707 (S.D.N.Y. 2012); *Moore v. Gulf Atl. Packaging Corp.*, No. 3:16-CV-886-PK, 2016 WL 8231142, at *17 (D. Or. Nov. 29, 2016), report and recommendation adopted, No. 3:16-CV-00886-PK, 2017 WL 540051 (D. Or. Feb. 9, 2017). It has been observed that "in all the cited opinions that precluded successor liability claims against asset purchasers in bankruptcy, the claimants were in front of the bankruptcy court during the bankruptcy proceedings, or the court found that the claimants should have brought their claims during the bankruptcy proceedings." *In re Ninth Avenue Remedial Group*, 195 B.R. at 732 (citing cases); *see also In re Mooney Aircraft, Inc.*, 730 F.2d 367, 375 (5th Cir. 1984); *City of St. Petersburg v. Total Containment, Inc.*, No. 06-20953-CIV, 2008 WL 11402030, at *6 (S.D. Fla. Nov. 4, 2008); *Thomas & Betts Corp. v. Myers Power Prods., Inc.*, No. CV 05-3464 (MLC), 2006 WL 8458477, at *7 (D.N.J. Jan. 30, 2006); *In re All Amer. Ashburn Inc.*, 56 B.R. 186, 189–90 (Bankr. N.D. Ga. 1986) ("[A] sale free and clear of claims cannot divest a . . . claim[] when the claimant does not have a sustainable cause of action at the time of the discharge."). Furthermore, preclusion of such future claims "would reward

debtors and asset purchasers who concealed claims known to them but unknown to potential claimants, undermining a 'cornerstone' of bankruptcy law." *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MC-2543 (JMF), 2017 WL 3382071, at *5 (S.D.N.Y. Aug. 3, 2017).

Here, Schall did not receive adequate notice of his potential claim in the ASMC bankruptcy proceedings because, at the time of the bankruptcy, there was no way for anyone to know that Schall would ever have a claim. "Enforcing the Sale Order against [Schall] to take away [his] right to seek redress under a state law theory of successor liability when [he] did not have notice or an opportunity to participate in the proceedings that resulted in that order would deprive [him] of due process." *In re Grumman Olson Indus., Inc.*, 467 B.R. 694, 708 (S.D.N.Y. 2012) (citing *Schwinn*, 217 B.R. at 797 ("Allowing the provisions of the Bankruptcy Court's orders to limit the rights of injured parties . . . who had no notice, and no reason at the time, to present an interest in the bankruptcy proceedings or to take action in response to the threatened deprivation of their rights, would violate due process and bankruptcy notice concerns."). Thus, the priority scheme of § 507(a) of the Bankruptcy Code is not frustrated because Schall was not a creditor at the time of the time of the bankruptcy proceedings.

Furthermore, with respect to the second public policy concern articulated by SMAI, the Court echoes the response by the Southern District of New York: "[T]o whatever extent maximizing the value of the estate is an important policy of the Bankruptcy Code, it is no more fundamental than giving claimants proper notice and opportunity to be heard before their rights are affected, to say nothing of constitutional requirements of due process." *In re Grumman Olson Indus.*, 467 B.R. at 710.

Finally, the Court would note that SMAI's reliance on *In re Trans World Airlines, Inc.*, 322 F.3d 283, 291–92 (3d Cir. 2003), is misplaced. *In re Trans World Airlines* involved extinguishing claims of actual claimants to the bankruptcy proceedings based on lawsuits for discrimination

claims pending *before* the bankruptcy petition was filed. The Court reasoned that allowing the claimants of unsecured claims to seek a recovery from the successor entity while creditors which were accorded higher priority by the Bankruptcy Code obtained their recovery from the limited assets of the bankruptcy estate would "subvert the specific priorities which define Congressional policy for bankruptcy distribution to creditors." *In re Trans World Airlines*, 322 F.3d at 292. Here, Schall did not have a lawsuit pending before the bankruptcy petition was filed. In fact, Schall had no claim against ASMC because he had not been injured at that time. Thus, *In re Trans World Airlines* is distinguishable from the facts of this case and does not support the extinguishment of Schall's claims based upon the application of the public policies underlying 11 U.S.C. § 363 of the Bankruptcy Code.

### 2. Preemption

SMAI argues that a conflict exists between 11 U.S.C. § 363 and any state law which allows claims to be brought against an entity that purchases a debtor's assets pursuant to § 363(f). SMAI maintains that such state laws are contrary to the objectives of the bankruptcy regime, including the ability under § 363(f)[2] to sell assets of a bankrupt debtor free and clear of liability, and therefore such laws are preempted by the federal bankruptcy laws. *See Myers v. United States,* 297 B.R. 774, 784 (S.D. Cal. 2003) (holding that § 363(f) preempts California state law regarding successor liability). In support of its argument that a conflict exists, SMAI points out that the Bankruptcy

---

[2] Section 363 provides:
> (f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if--
>> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>> (2) such entity consents;
>> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>> (4) such interest is in bona fide dispute; or
>> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C.A. § 363.

Court Order does not differentiate between claims that existed at the time of the sale and those that arose thereafter. In fact, the Order specifically states that SMAI and its assigns shall not be liable for any of ASMC's liabilities "whether asserted or unasserted, known or unknown, fixed or contingent, liquidated or unliquidated." [DN 278-1 at ¶ 42].

The Bankruptcy Code does not preempt Schall's state law product liability claims against SMAI. "Congress did not intend for the Bankruptcy Code to pre-empt all state laws . . . ." *Midlantic Nat. Bank v. New Jersey Dept. of Envtl. Prot.*, 474 U.S. 494, 505 (1986). "[T]here is no federal preemption of state law successor liability merely because the sale of assets occurred in a bankruptcy proceeding." *R.C.M. Exec. Gallery Corp. v. Rols Capital Co.*, 901 F. Supp. 630, 637 (S.D.N.Y. 1995). State successor liability law is preempted by federal law only to the extent that claims "underlying the successor's liability have been discharged under a plan of reorganization." *Williams v. U.S. Bancorp*, No. CV-06-197-LRS, 2008 WL 4279409, at *4 (E.D. Wash. Sept. 12, 2008); *see also Schwinn Cycling & Fitness Inc. v. Benonis*, 217 B.R. 790, 797 (N.D. Ill. 1997). Thus, the Bankruptcy Court Order does not preempt application of Kentucky state successor liability law in the present case.

Furthermore, none of the cases relied on by SMAI support the argument that the Bankruptcy Court's finding that SMAI is not a "successor in interest" determines whether under Kentucky law, SMAI is liable as a successor to ASMC. *Schwinn*, 217 B.R. at 797 ("By the same token, the fact that New Schwinn is not a 'successor in interest' under the Sale Order does not adjudicate whether, under applicable state law, New Schwinn is liable as a successor of the Debtors in the Pennsylvania action."). Instead, the issue of whether SMAI could be held liable as a successor under Kentucky law requires resolution of issues of both law and fact that were not addressed by the Bankruptcy Court. *See R.C.M. Exec. Gallery Corp.*, 901 F. Supp. at 636.

Finally, SMAI's reliance on *Myers v. United States*, 297 B.R. 774, 783 (S.D. Cal. 2003) is specious. The court in *Myers* concluded that "under the facts of this case," the bankruptcy code preempts California state law regarding successor liability where "[p]laintiff knew of the bankruptcy action and asked to participate," where "[p]laintiff never asked the Bankruptcy Court to reconsider its order barring successor liability," and where "[p]laintiff never appealed the Bankruptcy Court Order." *Id*. at 784. The court noted that "unsecured creditors can[not] 'lie in the weeds' and wait until the bankruptcy court approves a sale before it sues the purchasers." *Id*. Here, Schall was not an unsecured creditor at the time of the Asset Purchase Agreement or the Bankruptcy Court Order. Schall had no claim against ASMC at that time; in fact, Schall had not been injured. *Myers* is distinguishable from the facts of this case and is inapplicable.

For these reasons, Schall's product liability claims are not preempted.

## C. Successor Liability under Kentucky Law

"It is generally accepted in Kentucky that a corporation which purchases another corporation does not assume the payment of any debts or liabilities of the corporation which it has purchased." *Pearson v. Nat'l Feeding Sys., Inc.*, 90 S.W.3d 46, 49 (Ky. 2002) (citing *Am. Ry. Express Co. v. Commonwealth*, 228 S.W. 433, 441 (1920)); *Parker v. Henry A. Petter Supply Co.*, 165 S.W.3d 474, 478 (Ky. Ct. App. 2005). Kentucky recognizes four exceptions to the general prohibition against successor liability: "(1) where the purchaser expressly or impliedly agrees to assume such debts or other liabilities; (2) where the transaction amounts to a consolidation or merger of the seller and purchaser; (3) where the purchasing corporation is merely a continuation of the selling corporation; or (4) where the transaction is entered into fraudulently in order to escape liability for such debts." *Pearson*, 90 S.W.3d at 49; *Conn v. Fales Div. of Mathewson Corp.*, 835 F.2d 145, 147 (6th Cir. 1987). If one of those four exceptions applies, the purchaser, known as the "successor corporation," is liable for the debts and liabilities of its predecessor. Schall maintains

that at least two exceptions apply in the instant case: SMAI is the mere continuation of ASMC and SMAI was created to escape liability for the products liability claims.

### 1. Mere Continuation

Schall asserts that the mere continuation exception applies to the present case. According to this exception, if the new corporation is in major respects merely a continuation of the debtor—i.e., same company under a "new hat"—the new corporation will be responsible for the debts of its predecessor under the theory of successor liability. "In Kentucky, a determination of the continuity of a corporation after a sale depends on examining the sale agreement to determine continuity of shareholders or management." *Parker*, 165 S.W.3d at 479. "Even where an adequate consideration was paid for the assets, a successor company which continues with the same business, by the same officers and personnel, in the same location with only a slight change in name will be considered liable for the debts and liabilities of the selling company." *Id.* (citing *Payne–Baber Coal Co. of Ky. v. Butler*, 123 S.W.2d 273, 275 (Ky. 1938)). In determining whether the "mere continuation" exception applies, courts evaluate several elements:

> (1) continuity of shareholders and ownership, management, personnel, physical location, and business operations, (2) whether sufficient consideration was given, particularly whether stock was given in exchange, (3) whether the predecessor ceased business operations and was dissolved shortly after the new company was formed, (4) whether the successor company paid any outstanding debts on behalf of the previous company in order to continue business without interruption, (5) the buyer's intent or purpose when the new company was formed, and (6) whether the successor held itself out to the public as a continuation of the previous company.

*Dixstar v. Gentec Equip.*, Civ. A. No. 3:02CV-45-H, 2004 WL 3362501, *4 (W.D. Ky. Feb. 11, 2004) (footnotes and citations omitted). The Court balances all of these factors, and each factor need not be present for the mere continuation exception to apply. *Id.*

The factors enumerated in *Parker* and *Dixstar*, when applied to the facts in this case, lead the Court to the conclusion that a reasonable jury could find that SMAI is merely a continuation of

ASMC. In other words, a reasonable jury could find that there is a basic continuity of enterprise between the distribution of Suzuki products by ASMC and SMAI sufficient to justify imposition of liability on SMAI for injuries caused by defective Suzuki products sold by ASMC. *See, e.g.*, *Rivers v. Stihl, Inc.*, 434 So. 2d 766, 771 (Ala. 1983). Both ASMC and SMAI have the same sole shareholder—Suzuki—who owned 100% of ASMC's shares and now owns 100% of SMAI's shares. As correctly pointed out by Schall, ASMC and SMAI are both controlled by Suzuki; Suzuki appoints the board, which appoints the executives; and SMAI continues the same operations out of the same location using the same management and employees—performing essentially the same job functions—with the same equipment and resources as ASMC. For example, Tak Iwatsuki was ASMC's Board Chair and CEO and became SMAI's Board Chair and CEO. Similarly, Koicki Kato was ASMC's CFO and became CFO of SMAI. In fact, Senior Engineer Alexander Butt acknowledged the only change between ASMC and SMAI was the name of the Company and the fact that SMAI did not acquire the Automobile Sales Division. [DN 221-2; Butt Dep. at 19–23].

Furthermore, SMAI continues the same business operations as it relates to the Automotive Servicing Business, Motorcycles/ATV Division, and the Marine Business using the same email address, telephone numbers, and facilities, and Alexander Butt continued to use ASMC business cards. The Asset Purchase Agreement further provided that SMAI expressly assumed all of ASMC's employment and collective bargaining agreements. [*Id*. at 22]. SMAI performs the same services ASMC used to provide, including deploying support technicians, operating technical service lines, providing service recommendations, assisting dealers, and investigating customer complaints and maintenance issues. [*Id*. at 22–23].

The Court is aware that the Asset Purchase Agreement indicates that SMAI paid $65 million for ASMC's Automotive Servicing Business, Motorcycles/ATV Division, and the Marine Business assets, that SMAI did not purchase the auto sales business or hire the related 80

employees associated with the auto sales business, and that SMAI Corporate Representative Mark Eastman testified that SMAI was not a mere continuation of ASMC and that SMAI required all ASMC employees to apply to work at SMAI. [DN 206-3 at 72–89]. However, when viewing the evidence in the light most favorable to Schall, these factors alone cannot justify the Court resolving the issue of successor liability as a matter law.

SMAI argues that continuity of shareholders only supports the mere continuation theory of successor liability when it results from the purchasing corporation paying for the acquired assets with shares of its own stock. *See In re Wright Enters.*, 77 F. App'x 356, 369 (6th Cir. 2003). Specifically, SMAI contends that since Suzuki did not pay for SMAI's purchase of ASMC's motorcycle and marine business with its own stock, the continuation theory does not apply. This statement is inconsistent with Kentucky law which provides that "[e]ven where an adequate consideration was paid for the assets, a successor company which continues with the same business, by the same officers and personnel, in the same location with only a slight change in name will be considered liable for the debts and liabilities of the selling company." *Parker*, 165 S.W.3d at 479.

### 2. Fraud

Schall asserts that there is a question of fact concerning whether the Asset Purchase Agreement was entered into fraudulently to avoid liability for the product liability claims concerning the defective front brake master cylinder at a time when Suzuki and ASMC expected significant growth in those business lines. As discussed in other Memorandum Opinions issued today, Schall submitted evidence that reflects that ASMC/SMAI and Suzuki were well aware of the defects yet chose to conceal it from the public. It is undisputed that by April 2013, if not before, the Defendants understood that gas was accumulating in the front brake master cylinder—a dangerous condition causing issues with the reactivity of the motorcycle's front brake. [DN 185

at 8; DN 208 at 5; DN 225-31 at 1]. Defendants also knew that 5-10% of the pistons in the brake master cylinder received surface coating during manufacture that did not meet Defendants' internal specifications. [DN 185 at 8; DN 208 at 5; DN 225-35]. It is also clear that at this same time Defendants believed there to be a "serious safety issue" requiring an active response. [DN 225-2 at 3; *see also* DN 225-31 at 1, DN 225-34 at 1]. Schall also presented evidence that, despite knowledge of the problem, Defendants failed to warn consumers of the problem and did not begin the process of issuing a recall notice until October 2013. [DN 225-3].

Suzuki formed SMAI on October 31, 2012, placed ASMC into voluntary bankruptcy on November 5, 2012, and ASMC and SMAI executed the asset purchase agreement a day later transferring ASMC's assets to another wholly owned subsidiary of Suzuki. Additionally, SMAI Senior Engineer Alexander Butt testified that SMAI was formed for the sole purpose of acquiring ASMC's assets. [DN 221, Butt Dep. at 14]. In light of the evidence reflecting corporate knowledge coupled with the timing of the bankruptcy and the Asset Purchase Agreement, a reasonable jury could infer the sale process was intended to eliminate ASMC's liability for product liability claims related to the brake defect. As such, a genuine dispute of fact exists on this issue.

**D. Kentucky Middleman Statute**

SMAI maintains that even if it has successor liability for ASMC's role in the distribution of the subject motorcycle, ASMC itself would be immune under the Kentucky Middleman Statute. It contends that ASMC distributed the motorcycle but had no independent responsibility for its design or manufacture, and, as a result, the Kentucky Middleman Statute, KRS § 411.340, insulates it from liability. KRS § 411.340 provides:

> In any product liability action, if the manufacturer is identified and subject to the jurisdiction of the court, a wholesaler, distributor, or retailer who distributes or sells a product, upon his showing by a preponderance of the evidence that said product was sold by him in its original manufactured condition or package, or in the same condition such product was in when received by said wholesaler, distributor or

retailer, shall not be liable to the plaintiff for damages arising solely from the distribution or sale of such product, unless such wholesaler, distributor or retailer, breached an express warranty or knew or should have known at the time of distribution or sale of such product that the product was in a defective condition, unreasonably dangerous to the user or consumer.

KRS § 411.340.

The rationale underlying the statute is that "retailers are unaware of design and manufacturing considerations and it is therefore unfair to hold them responsible for the mere sale of a defective product where the manufacturer is also before the Court." *Mason v. Excel Industries, Inc.*, No. 3:10-CV-175, 2011 WL 847449, *2 (W.D. Ky. Mar. 9, 2011); *Weixler v. Paris Co., Inc.*, No. CIV.A. 3:02CV390H, 2003 WL 105503, *1 (W.D. Ky. Jan. 2, 2003). Therefore, KRS § 411.340 relieves middlemen—wholesalers, distributors or retailers—of liability or damages arising solely from the distribution or sale of such product where: (1) the manufacturer is identified and subject to the Court's jurisdiction; (2) the product was sold by the wholesaler, distributor, or retailer in its original manufactured condition; *and* (3) the middleman has neither breached an express warranty; *or* (4) the middleman did not know or have reason to know that the product was unreasonably dangerous. *Taylor v. Southwire Tools & Equip.*, 130 F. Supp. 3d 1017, 1020 (E.D. Ky. Sept. 11, 2015); *Worldwide Equip., Inc. v. Mullins*, 11 S.W.3d 50, 60 (Ky. Ct. App. 1999); *Salisbury v. Purdue Pharma, L.P.*, 166 F. Supp. 2d 546, 551 (E.D. Ky. 2001); *Adams v. Minn. Mining & Mfg. Co.*, Nos. 4:03-CV-182-M, 4:04-CV-2-M, 2004 WL 718917, at *3 (W.D. Ky. Mar. 30, 2004); *Flint v. Target Corp.*, 362 F. App'x 446, 449 (6th Cir. 2010); KRS § 411.340.

With respect to Schall's claims against SMAI based on design defect, manufacturing defect, or marketing, advertising, or promoting, the Court grants summary judgment as to those claims based on the Kentucky Middleman Statute. In fact, Schall does not dispute that the statute precludes his product liability claims against SMAI that are based *solely* on the distribution or sale of the motorcycle, but claims instead that his post-sale failure to warn claims survive the

application of the statute. First, Schall asserts an independent negligence claim against SMAI based on its post-sale failure to warn Schall of the defective design after it took over ASMC's operations in April 2013. Schall also asserts a second independent negligence claim against SMAI as successor to ASMC based on ASMC's post-sale failure to warn Schall of the front brake master cylinder defect. Contrary to Schall's framing, both negligence claims necessarily derive from SMAI's successor liability. If SMAI is not a successor to ASMC, SMAI could owe no duty to warn of potential defects in products it did not produce, manufacturer, or distribute. In other words, Schall's assertion of two independent bases upon which he may recover for post-sale failure to warn is improper. Instead, he may proceed with only one claim for post-sale failure to warn premised upon successor liability.

"Kentucky law imposes a general duty on manufacturers and suppliers to warn of dangers known to them but not known to persons whose use of the product can reasonably be anticipated." *Watters v. TSR, Inc.*, 904 F.2d 378, 381 (6th Cir. 1990). "This duty may arise under general negligence principles; however, '[a] defendant's duty to warn is confined to risks either known or knowable by the exercise of reasonable care.'" *Waltenburg v. St. Jude Med., Inc.*, 33 F. Supp. 3d 818, 838 (W.D. Ky. 2014) (quoting *Prather*, 960 F. Supp. 2d at 712); s*ee also Smith v. Parker-Hannifin Corp.*, No. 5:12-CV-00136-TBR, 2014 WL 1418288, at *6 (W.D. Ky. Apr. 14, 2014) ("To withstand summary judgment, a plaintiff alleging failure to warn must provide evidence that: (1) Defendants had a duty to warn; (2) the warnings Defendants gave were inadequate; and (3) the inadequate warnings were the proximate cause of the plaintiff's injuries.").

Additionally, as discussed in a separate Memorandum Opinion and Order, the Kentucky Supreme Court recognizes a negligence claim in the product liability context based on a defendant's post-sale failure to warn. *See Clark v. Hauck Mfg. Co.*, 910 S.W.2d 247, 251 (Ky. 1995) (holding that "[t]he duty of ordinary care embraces such questions as the duty of the

22

manufacturer to review design and if he knew or should have known that his design was defective to make an effort to notify the purchasers of his equipment of these findings subsequent to the sale of the product."); *Jackson v. E-Z-GO Div. of Textron, Inc.*, No. 3:12-CV-154-TBR, 2015 WL 4464098, at *3 (W.D. Ky. July 21, 2015) (noting that under Clark "in situations where—after a sale—a manufacturer comes to know or should have known about a defective product, then that manufacturer must 'make an effort to notify the purchasers'"). While the cases recognizing a post-sale duty to warn in Kentucky involve claims made against manufacturers, the Court is of the opinion that such duty would be recognized as to distributors as well.

Here, the Court finds that the Kentucky Middleman Statute does not insulate SMAI from liability for the post-sale failure to warn claim. The evidence reflects that ASMC and SMAI knew about the defects in the GSX-R600, they engaged in significant communications with Suzuki regarding the alleged defects, and they believed there to be a "serious safety issue" requiring an active response. [DN 241-2 at 3]. The Kentucky Middleman Statute relieves a wholesaler, distributor, or retailer of liability or damages in a products liability action, including point-of-sale failure to warn claims, unless the middleman knew or should have known that the product was unreasonably dangerous. Thus, if the middleman knew or should have known about a defect, the Kentucky Middleman Statute would provide no protection for the middleman. It is the Court's view that it is unreasonable to afford SMAI protection from claims of post-sale failure to warn under the Kentucky Middleman Statute where it would not have been entitled to such protection for the same conduct if it occurred at the point of sale.

For these reasons, summary judgment on Schall's negligent post-sale failure to warn claim is denied.

#### IV.    CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that the motion by Defendant Suzuki Motor of America, Inc.'s Motion For Summary Judgment [DN 206] is **GRANTED in part and DENIED in part**. The Court **GRANTS** summary judgment on Plaintiff's strict liability and negligent claims based on design defect, manufacturing defect, or marketing, advertising, or promoting against SMAI. The Court **DENIES** summary judgment on Plaintiff's negligent post-sale failure to warn claim against SMAI.

Joseph H. McKinley Jr., Senior Judge
United States District Court

cc: counsel of record

March 31, 2020