UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

CIVIL ACTION NO: 4:14-CV-00074-JHM

DEREK SCHALL                                                                          PLAINTIFF

V.

SUZUKI MOTOR OF AMERICA, INC.,
SUZUKI MOTOR CORP., and
NISSIN KOGYO CO., LTD.                                                          DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendants' respective Motions for Partial Summary Judgment on Plaintiff's Punitive Damages Claim. [DN 185; DN 208]. Fully briefed, these matters are ripe for decision.

## I. BACKGROUND

Plaintiff Derek Schall was injured in a motorcycle accident on July 19, 2013, in Daviess County, Kentucky. [DN 5 ¶ 39]. He alleges that the accident was caused by defects in the front brake master cylinder on the motorcycle, a 2007 Suzuki GSX-R600. [*Id.*] He has brought an action against Suzuki Motor Corporation ("SMC"), the manufacturer of the motorcycle; Suzuki Motor of America, Inc. ("SMAI"), the importer of the motorcycle; and Nissin Kogyo Co., Ltd. ("Nissin"), the manufacturer of the front brake master cylinder, alleging strict products liability and negligence. [*Id.* ¶ 41–52]. As a result of the accident, Schall seeks both compensatory and punitive damages against the defendants. Specifically, he claims that the defendants "risked the lives of consumers and users of their products" and that such conduct "was extreme and outrageous." [*Id.* ¶ 55].

SMC, SMAI, and Nissin move for partial summary judgment on Schall's claim for punitive damages. [DN 185; DN 208]. SMC and Nissin argue that because Japanese law applies to the claims against them and punitive damages are not awarded for products liability actions in Japan,

1

the claim for punitive damages must be dismissed. [DN 185 at 2; DN 208 at 2]. In the alternative, SMC and Nissin argue that under Kentucky law, Schall cannot present the requisite clear and convincing evidence to support a punitive damages claim. [*Id.*]. SMAI does not contest the applicability of Kentucky law to Schall's claims against it but joins the latter argument that he fails to show that it engaged in egregious conduct as is required to be entitled to punitive damages. [DN 208 at 2]. Schall responds that Kentucky law controls his action and, as such, he may seek punitive damages. [DN 225 at 26–36]. Further, Schall maintains that two independent bases support his claim for punitive damages—Defendants' use of outdated technology, known to be dangerous, in their brake design and Defendants' intentional concealment of the dangerous brake defect from several relevant groups. [*Id.* at 1; 18–26].

## II. STANDARD OF REVIEW

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying the portion of the record that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of

materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

### III. DISCUSSION

SMC moved with SMAI for summary judgment on Schall's punitive damages claim. [DN 185]. Nissin independently moved for the same. [DN 208]. As support, SMC and Nissin both contend that constitutional and choice-of-law principles require application of Japanese law, which prohibits the recovery of punitive damages in products liability actions. [DN 185 at 2; DN 208 at 2]. In a Memorandum Opinion and Order entered on November 19, 2019, the Court held that Kentucky substantive law applies to this action. [DN 291]. Therefore, the Court now turns its attention to the second theory.

Defendants jointly argue that Schall cannot prove by clear and convincing evidence that they engaged in the egregious conduct required for a punitive damages jury instruction. [DN 185 at 27–35; DN 208 at 21–28]. Schall in turn argues that there are two bases upon which punitive damages may be premised—the use of outdated technology in the motorcycle's brake design and the intentional concealment of the dangerous brake defect from the public, the dealers, and U.S. regulators tasked with overseeing them. [DN 225 at 2]. The Court addresses each basis and the challenges to it below.

Ky. Rev. Stat. § 411.184(2) states that a "plaintiff shall recover punitive damages only upon proving, by clear and convincing evidence, that the defendant from whom such damages are sought acted toward the plaintiff with oppression, fraud or malice." This clear and convincing standard can be met by producing evidence of a probative and substantial nature carrying sufficient

weight to convince ordinarily prudent-minded people of its validity. *See W.A. v. Cabinet for Health & Family Servs.*, 275 S.W.3d 214, 220 (Ky. App. 2008). The Sixth Circuit has held that "where the nonmoving party faces a heightened burden of proof, such as clear and convincing evidence, he must show in opposition to the motion for summary judgment that he can produce evidence which, if believed, will meet the higher standard." *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 944 (6th Cir. 1990), *overruled on other grounds by Salve Regina College v. Russell*, 499 U.S. 225 (1991).

In *Williams v. Wilson*, the Kentucky Supreme Court found that the statute's requirement of "malice" is unconstitutional. 972 S.W.2d 260 (Ky. 1998). In so doing, it held that to impose punitive damages, conduct must amount to at least common-law "gross negligence." *Id.* In *Horton v. Union Light, Heat & Power Co.*, the Kentucky Supreme Court explained this standard, noting that to justify punitive damages, "there must be first a finding of failure to exercise reasonable care, and then an additional finding that this negligence was accompanied by 'wanton or reckless disregard for the lives, safety or property of others.'" 690 S.W.2d 382, 389–90 (Ky. 1985) (citation omitted).

It is worth noting at the outset that, in a corresponding Memorandum Opinion and Order, the Court granted SMAI's Motion for Summary based on the applicability of Kentucky's Middleman statute as to all claims except negligent failure to warn. Accordingly, the reference to "Defendants" in the discussion of a punitive damages claim based on use of outdated technology refers only to SMC and Nissin. The reference to "Defendants" in the discussion of a punitive damages claim based on negligent failure to warn refers to all three defendants.

**A. Use of Outdated Technology Known to be Dangerous**

Schall first argues that Defendants' use of outdated technology, known to be dangerous, in their brake design requires submission of the question of punitive damages to a jury. [DN 5 ¶ 56; DN 225 at 19–22]. Schall maintains that it was well known within the industry that zinc materials—like the zinc piston in the brake master cylinder—could lead to corrosion and the development of hydrogen gas. [DN 225 at 19]. As evidence, Schall points to the fact that the materials used in the brake master cylinder—specifically, a zinc piston with DOT 4 brake fluid and no protective rubber seal—have not been used in the industry in the U.S. since the 1970s. [*Id.*]. Defendants respond that Schall has no reliable proof that the use of a zinc piston in the subject brake master cylinder is outdated and that no clear and convincing evidence exists to prove that Defendants' conduct reached the level of gross negligence. [DN 262 at 11–14; DN 281 at 10–13].

Schall points to *Clark v. Chrysler Corp.*, 436 F.3d 594 (6th Cir. 2006), as support for this punitive damages claim. Therein, the Sixth Circuit reexamined a punitive damages award granted to the widow of a man killed after he was ejected from his vehicle following a collision. The Court concluded that the evidence in the case was "sufficient to support the jury's decision to award punitive damages" because the dangerous design constituted a reckless disregard for the safety of others but reduced the award to a 2:1 ratio for such damages. *Id.* at 602, 607. In an earlier opinion, the Sixth Circuit explained the pieces of evidence which supported the punitive damages award. *Clark v. Chrysler Corp.*, 310 F.3d 461 (6th Cir. 2002), *vacated on other grounds*, 540 U.S. 801 (2003). That evidence included: (1) testimony about the inadequacy of the vehicle part and its inability to withstand low impact accidents; (2) testimony about how the problems with the part could have easily been addressed as there were other similar vehicles manufactured at the time without such an issue; (3) testimony that the subject vehicle was not state-of-the-art or

5

state-of-the-industry and that a state-of-the-industry part would have prevented the accident; (4) the fact that several alternative designs were being used which did not cause such a problem and were not more expensive than the part in the subject vehicle; (5) the fact that the defendant itself had utilized some of those other designs in its vehicles; (6) testimony that there were many inexpensive ways the part could have been fixed to prevent the issue; (7) the fact that the defendant did not test the part for the relevant problem; and (8) evidence that the defendant knew of a potentially serious safety issue if such parts were not designed properly. *Id.* at 480–81.

Schall draws a comparison between *Chrysler* and the instant action—the use of outdated technology with known dangers supports a punitive damages award. Here, Schall argues that the materials used caused a risk of degradation of brake fluid which could then in turn cause a build up of hydrogen gas in the brake master cylinder and that Defendants knew or should have known of this risk. Schall designated several experts who intend to testify about the corrosive qualities of zinc. Defendants moved to exclude the testimony of each, but, as is discussed in further detail in corresponding memorandum opinions and orders, the Court denied each of those motions as to this particular testimony. Additionally, Schall submitted evidence to the Court which further supports this position.

At the outset, the Court must address Defendants' argument that if Schall's underlying claim fails, he cannot recover punitive damages. This is a correct reading of the law. *Horton v. Union Light, Heat & Power Co.*, 690 S.W.2d 382, 390 (Ky. 1985) (stating that in order to justify punitive damages "there must be first a finding of failure to exercise reasonable care"). As is discussed in greater detail in a separate memorandum opinion and order, Defendants are not entitled to summary judgment on Schall's design defect claim. That being the case, the Defendants' first argument fails. Additionally, the Court must note that both sets of Defendants

played a role in the decisions that led to a zinc piston being used in conjunction with DOT 4 brake fluid. In a letter dated January 22, 2016, SMAI's counsel stated that "[t]he proposal for a zinc piston in the front brake master cylinder was made by Nissin Koyogo. . . . The SMC Motorcycle Body Design Group selected DOT4 brake fluid." [DN 225-13 at 1]. The Court is convinced that, at this stage, Schall has presented sufficient evidence to survive both SMC and Nissin's Motions for Summary Judgment. Below the Court outlines the evidence found to be persuasive in reaching this decision.

Jeffrey Hyatt, a forensic engineer, submitted two expert reports in this matter–one in 2017 and a supplemental report in 2018. [DN 225-9; DN 225-16]. In his first report, Hyatt explains that an earlier model of the front master cylinder—used by Suzuki for its 1997–2003 GSX-R— insulated the spring from the zinc piston with a rubber piston cup. [DN 225-9 at 11]. He explains that this design—which included a rubber barrier to prevent galvanic coupling—prevented corrosion of the zinc and buildup of hydrogen gas. [*Id.* at 8]. This testimony, like that which was found persuasive in *Chrysler*, is evidence that Suzuki itself had utilized a different, and less dangerous, design in a prior model.

Having reviewed the subject brake master cylinder components, Hyatt's expert report discusses in-depth the use of zinc as a brake system material and, based on substantial research, concludes that zinc had not be used in brake systems for decades because of its tendency to corrode with brake fluid. [*Id.* at 9]. As support, Hyatt cites to a Society of Automotive Engineers paper addressing brake fluids and specifications in Europe which discusses the phenomenon experienced here. The paper states that certain brake fluids—though not specifically DOT 4 brake fluid—will "react with zinc alloys resulting in formation of hydrogen gas, leading to 'spongy' brake pedals." [*Id.* at 27]. Hyatt further supports his opinion that zinc is not used in hydraulic brake systems by

7

pointing to the fact that manufacturers of DOT 3 and DOT 4 standard brake fluids were not required to formulate their brake fluids in order to protect zinc components. [*Id.*]. A final piece of convincing testimony is Hyatt's statement that in over thirty years of vehicle hydraulic brake experience, he never encountered zinc being used on internal hydraulic brake systems. [*Id.*].

In Hyatt's supplemental report, he specifically examines and compares the subject piston with a Brembo Company piston formed of aluminum. He explains that both a new Brembo brake master cylinder and a 2004 used Brembo master cylinder used aluminum—a material that does not exhibit the same erratic corrosive qualities of zinc. [DN 225-16 at 3–4]. Hyatt states that the Brembo arrangement was virtually identical to the subject Suzuki arrangement with the only real difference being the use of aluminum and that the Brembo aluminum piston would have fit into the Suzuki master cylinder. [*Id.* at 4]. This evidence, like that in *Chrysler*, shows how the problem with the part could have easily been addressed as there were other similar pistons manufactured at the time without such an issue.

Schall also submits evidence provided by Dr. Thomas Balk, whom the Court found to be a qualified expert in mechanical engineering and materials science in an earlier Memorandum Opinion and Order. [DN 299]. In his expert report, Dr. Balk opines that "a reasonably prudent manufacturer should have considered the potential chemical reactions that may occur between the materials used in a part or assembly, and apply appropriate materials design considerations regarding potentially dangerous chemical interactions." He explained that "[t]his is especially important for a motorcycle braking system that includes the use of a material such as zinc, which is known to be susceptible to corrosion." [DN 225-17 at 4]. This opinion is supported by citation to a standard textbook used in sophomore-level courses on materials science and engineering— courses typically taken by mechanical engineers as well as materials engineers. [*Id.*]. According

8

to Dr. Balk, the book, "Fundamentals of Materials Science and Engineering – An Integrated Approach", discusses the corrosion of zinc, along with the generation of hydrogen gas. [*Id.*; *see also* DN 225-12 at 13:17–14:20]. Dr. Balk's deposition testimony further corroborates this point. He testified that zinc is a key material to discuss when dealing with corrosion because it is a "classic metal involved in corrosion situations . . . ." [DN 225-12 at 38:13–17].

Dr. Balk's expert report also proposes a solution to the zinc corrosion issue. [DN 225-17 at 4]. He explains that "[z]inc is known to be reactive and susceptible to corrosion. In situations where corrosion of steel/iron structures needs to be prevented, a classic and simple solution is to connect a piece of zinc to the structure and place it in the same environment, so that the zinc will preferentially corrode." [*Id.*]. Dr. Balk states that the piece of zinc acts as a "sacrificial anode" and "may be used to protect a ship's steel hull or the steel chamber of a hot water heater, to list two standard examples." [*Id.*]. Dr. Balk's testimony supports the argument that the brake piston was inadequate, and that Defendants should have been aware of this fact.

Another expert identified by Schall—Dr. Rex McLellan—confirmed at his deposition that "a large volume of scientific and automotive engineering work over a span of 30 to 40 years pointed out the dangers involved in using zinc as a [brake master cylinder] piston material." [DN 225-18 at 159:1–17]. Dr. McLellan is a licensed professional engineer with several decades of experience in materials science and engineering. The Court previously found Dr. McLellan qualified to offer expert opinions in this case. [DN 298]. Dr. McLellan makes his point most persuasively by explaining that the corrosive qualities of zinc "was common knowledge for decades" and that Defendants have sophisticated engineers working for them who should have been aware of the dangers of zinc in this context. [DN 225-18 at 159:12–17, 160:6–14].

9

The final expert relevant to this matter is Dr. Rudy Limpert. Dr. Limpert, another individual deemed qualified to provide expert opinions in this matter [DN 301], has expertise in brake system design and safety analysis. Particularly relevant to Schall's argument, Dr. Limpert states that "[t]he brake system of any motor vehicle is the most important safety system available to a driver for crash avoidance." [DN 225-5 at 3]. Similar testimony was found persuasive in *Chrysler* because it is evidence that Defendants knew of a potentially serious safety issue if the brake system was not designed properly. He further opines that it does not appear that Defendants considered the importance of the interaction of the materials used in the GSX-R brake master cylinder, including the zinc piston, spring, and coating application. [*Id.* at 4]. Additionally, Dr. Limpert states that Defendants do not appear to have "considered the potential chemical reactions that would be generated if those materials reacted through normal use and with the brake fluid." [*Id.*]. In tying this opinion together, Dr. Limpert expresses the opinion that "[a]ny prudent and reasonable company must[,] when designing something as important as a brake system[,] make sure that they fully understand the potential chemical interactions between the materials that they are using and the impact of such reactions on brake performance." [*Id.*].

In addition to the above expert testimony, Schall also submitted several documents which support his potion. First, Schall submitted safety data sheets for three different brands of DOT 4 brake fluid—Champion, Valvoline, and Maxima—all of which note that zinc is incompatible with the brake fluid. [DN 225-15 at 7, 22, 31]. Although the release dates for the data sheets for two of the three are after Schall's accident, the Court considers them further support for the general proposition that zinc is incompatible with DOT 4 brake fluid. Second, Schall provides an internal email in which SMC's motorcycle group contacted the auto group concerning the use of zinc. In

that email, the auto group responded that "no zinc plating is used . . . . Some kinds of brake fluid react with zinc plating at high temperature and generate hydrogen." [DN 225-19 at 1].

It is worth noting that Defendants assert several additional arguments to the contrary. Defendants maintain that they complied with industry standards by using parts regularly used in the brake industry, that the materials used had long been used in the industry without issue, and that because they performed some pre- and post-production tests, summary judgment is appropriate. While the Court may entertain some doubt as to whether Schall's claims will ultimately entitle him to punitive damages, the facts before the Court yield more than one reasonable conclusion. In other words, considering all the evidence submitted by the parties, and viewing that evidence in a light most favorable to Schall, the Court is persuaded that summary judgment is inappropriate.

"The threshold for the award of punitive damages is whether the misconduct was 'outrageous' in character, not whether the injury was intentionally or negligently inflicted." *Peoples Bank of N. Ky., Inc. v. Crowe Chizek & Co. LLC*, 277 S.W.3d 255, 268 (Ky. Ct. App. 2008). Defendants' culpability, as presented in Schall's evidence, does rise to this level. *See Clark v. Chrysler Corp.*, 436 F.3d 594, 602 (6th Cir. 2006) (finding that the evidence submitted was sufficient to find a reckless disregard for the safety of others). It is the Court's judgment that Schall has submitted sufficient evidence which, if believed, will meet the higher standard required for punitive damages. *See White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 944 (6th Cir. 1990), *overruled on other grounds by Salve Regina College v. Russell*, 499 U.S. 225 (1991). This finding does not effectively eliminate the distinction between ordinary and gross negligence. There may very well be instances in which manufacturers negligently design a product but do not do so with the foresight Defendants had or should have had concerning the materials used. *See*

*Kinney v. Butcher*, 131 S.W.3d 357, 359 (Ky. App. 2004) (declining to authorize punitive damages where allowing such damages would "effectively eliminate the distinction between ordinary and gross negligence"). Accordingly, Defendants' Motions for summary judgment on this score are **DENIED**.

B. **Intentional Concealment of the Dangerous Brake Defect**

Schall also argues that Defendants intentionally concealed the dangerous brake defect from the public, the motorcycle dealers, and the U.S. regulators tasked with overseeing them. This allegation ties in with Schall's claim of a post-sale failure to warn purchasers of the discovered defect and its attendant safety issues. [DN 225 at 22–24]. Defendants divide their opposition to this claim into two basic arguments—first, that there is no private right of enforcement of a manufacturer's reporting obligations to the National Highway Traffic Safety Administration ("NHTSA"), and second, that Kentucky does not recognize a post-sale duty to recall or issue warnings. [DN 185 at 28–29; DN 208 at 22–26]. The Court addresses each argument in turn.

Defendants correctly point out that there is no private right of action to enforce a manufacturer's reporting requirements to the NHTSA. Schall does not dispute the state of the law as to this point. Instead, he states that the "NHTSA requires manufacturers to disclose safety defects to NHTSA within five days of learning of them," and that it "is clear that Defendants failed to do so here." [DN 225 at 23]. Schall goes on to agree with Defendants concerning the private right of action. [*Id.* at 24 n.77]. Specifically, Schall states that he "puts forth the claim that Defendants' conduct violated NHTSA's 5-day requirement to preserve the issue for appeal," and suggests that the statute may still be used to evince the relevant industry reporting standard. [*Id.*].

Defendants next argue that Kentucky does not recognize a duty by a manufacturer to recall, retrofit, or warn about a product that was not defective when sold and accordingly, there is no basis

for Schall to recover punitive damages. [DN 208 at 23]. Schall in turn responds that his brake master cylinder was defective at the time of sale and that when Defendants became aware of the defect, they actively concealed such from their customers. [DN 225 at 22–24]. As is discussed extensively in a separate Memorandum Opinion and Order, the Court determines that Kentucky does recognize a post-sale duty to warn claim for products that were defective when sold.[1] Further, as is mentioned above, Defendants are not entitled to summary judgment on Schall's design defect claim at this stage as there remain genuine issues of material fact. Having determined that Kentucky does recognize a post-sale failure to warn claim for products that were defective when sold and that genuine issues of fact remain on Schall's design defect claim, it is now necessary to determine whether Defendants are entitled to summary judgment on Schall's punitive damages claim premised on the alleged failure to warn.

Defendants' last argument on this score is factual—Schall cannot prove that Defendants acted with oppression, malice, fraud, or were grossly negligent. [DN 185 at 30–34; DN 208 at 26–28]. The argument is premised on the notion that complex product issues require significant time and effort to identify and resolve. Defendants maintain that they acted reasonably in the investigation and recall of the front brake master cylinder on the GSX-R. Schall, in turn, argues that each defendant is responsible for the failure to warn. Schall explains that both SMC and Nissin were well aware of the defect yet chose to conceal it from the public. Specifically, Schall states that "Nissin actively encouraged SMC to delay the disclosure to see if a non-defect pretextual argument could be made about user maintenance, which would save both of them tens

---

[1] Nissin makes a brief argument in its Motion that it had no authority to issue a recall of the Suzuki GSX-R and, as such, it cannot be liable for a punitive damages claim premised on such. [DN 185 at 30–31]. Nissin reads Schall's Amended Complaint too narrowly. The Complaint states that "Defendants made conscious decisions to not issue a recall sooner *or* otherwise notify owners of the defective and dangerous condition of the affected Suzuki motorcycles." [DN 5 ¶ 55]. Nissin makes no argument as to why it, as a component parts manufacturer, had no post-sale duty to warn and there appears to be no such reason at this time. *See also Embs v. Pepsi-Cola Bottling Co. of Lexington, Ky., Inc.*, 528 S.W.2d 703, 705 (Ky. 1975).

13

of millions of dollars." [DN 225 at 24]. Further, Schall argues that SMAI is liable for the post-sale failure to warn claim based on a theory of successor liability after having taken over for the now-defunct American Suzuki Motor Corporation.

As discussed above, "[i]n order to justify punitive damages there must be first a finding of failure to exercise reasonable care, and then an additional finding that this negligence was accompanied by 'wanton or reckless disregard for the lives, safety or property of others.'" *Horton v. Union Light, Heat & Power Co.*, 690 S.W.2d 382, 389–90 (Ky. 1985) (citation omitted). The Court addresses the first prong of this standard in detail in a corresponding Memorandum Opinion and Order. Though that opinion addresses the evidence in light of the summary judgment standard, the Court believes that for the same reasons outlined therein, Schall presented sufficient evidence to satisfy his heightened burden for punitive damages. *See W.A. v. Cabinet for Health & Family Servs.*, 275 S.W.3d 214, 220 (Ky. App. 2008). The only remaining question then is whether Schall presented evidence that Defendants' failure to exercise reasonable care in carrying out those duties rises to the requisite level of culpability. The Court believes that he has.

The crux of Schall's argument is that the Defendants knew by April 2013 what was wrong with the brake system but failed to notify the public or issue a recall until October 2013 because it was attempting to cobble together a way in which the defect could be blamed on user error. [DN 225 at 25–26]. The Court, having reviewed the documents submitted by all parties, believes that Schall has presented sufficient evidence that could convince ordinarily prudent-minded people that Defendants behaved in an outrageous manner. *See W.A. v. Cabinet for Health & Family Servs.*, 275 S.W.3d 214, 220 (Ky. App. 2008). It is undisputed that by April 2013, the Defendants understood that gas was accumulating in the front brake master cylinder—a dangerous condition causing issues with the reactivity of the motorcycle's front brake. [DN 185 at 8; DN 208 at 5; DN

225-31 at 1]. Defendants also knew that 5-10% of the pistons in the brake master cylinder received surface coating during manufacture that did not meet Defendants' internal specifications. [DN 185 at 8; DN 208 at 5; DN 225-35]. It is also clear that at this same time Defendants believed there to be a "serious safety issue" requiring an active response. [DN 225-2 at 3; *see also* DN 225-31 at 1, DN 225-34 at 1]. An internal document listed both the merits and risks of implementing a recall and choosing not to do so. [DN 225-2 at 4]. Listed as a risk of not implementing a recall, the document noted that "[i]f the problem becomes public in the future, Suzuki Head Office will be held to account for its response. (Concealment of recall, breach of obligation to notify)." [*Id.*]. The document indicates that Defendants had sufficient foresight in April 2013 to understand what would happen if they chose not to warn consumers or issue a recall.

Schall presented evidence that, despite knowledge of the problem, Defendants failed to warn consumers of the problem and did not begin the process of issuing a recall notice until October 2013. [DN 225-3]. Further, Schall presented evidence that the delay occurred not because Defendants were attempting to understand the conditions that caused the phenomenon but because they were attempting to manufacture an alternative cause for the issue—specifically, user error. [DN 225 at 25–26; DN 225-2; DN 225-46; DN 225-47; DN 225-48 at 1; DN 225-49]. Because a jury could reasonably find that Defendants failed to exercise reasonable care, as is discussed in the corresponding Memorandum Opinion and Order, and that the failure was outrageous, summary judgment on Schall's claim of punitive damages against Defendants is unwarranted. *See Peoples Bank of N. Ky., Inc. v. Crowe Chizek & Co. LLC*, 277 S.W.3d 255, 268 (Ky. Ct. App. 2008) ("The threshold for the award of punitive damages is whether the misconduct was 'outrageous' in character, not whether the injury was intentionally or negligently inflicted.") (citing *Horton v.*

*Union Light, Heat & Power Co.*, 690 S.W.2d 382, 389 (Ky. 1985)). Defendants' Motions on this basis are **DENIED**.

### IV. CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Defendants' Motions for Partial Summary Judgment on Plaintiff's Punitive Damages Claim [DN 185; DN 208] are **DENIED**.

Joseph H. McKinley Jr., Senior Judge
United States District Court

March 31, 2020

cc: counsel of record