# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
### OWENSBORO DIVISION

CIVIL ACTION NO: 4:14-CV-00074-JHM

**DEREK SCHALL**                                                                            **PLAINTIFF**

**V.**

**SUZUKI MOTOR OF AMERICA, INC.,**
**SUZUKI MOTOR CORP., and**
**NISSIN KOGYO CO., LTD.**                                                          **DEFENDANTS**

### <u>MEMORANDUM OPINION AND ORDER</u>

This matter is before the Court on Defendants' respective Motions for Summary Judgment. [DN 182; DN 203]. Fully briefed, these matters are ripe for decision.

### I.     BACKGROUND

Plaintiff Derek Schall was injured in a motorcycle accident on July 19, 2013, in Daviess County, Kentucky. [DN 5 ¶ 39]. He alleges that the accident was caused by defects in the front brake master cylinder on the motorcycle, a 2007 Suzuki GSX-R600. [*Id.*] He brought an action against Suzuki Motor Corp. ("SMC"), the manufacturer of the motorcycle; Suzuki Motor of America, Inc. ("SMAI"), the importer of the motorcycle; and Nissin Kogyo Co., Ltd. ("Nissin"), the manufacturer of the subject brake master cylinder, alleging strict products liability and negligence. [*Id.* ¶¶ 41–52].

The GSX-R is a high-performance motorcycle designed and manufactured by SMC. Nissin produced the front brake master cylinder on this particular iteration of the GSX-R. The front brakes of the GSX-R use hydraulic brake pressure, generated from the operator's application of the brake lever acting on brake fluid, to slow the motorcycle. The brake system on this particular motorcycle was made up of several parts, including the brake master cylinder produced by Nissin. The actual brake master cylinder is also made up of several individual parts, all produced by Nissin—including a piston, a piston spring, and a reservoir port.

Nissin began the design and development of the brake master cylinder for the GSX-R in 2003. It designed and manufactured the component part in accordance with SMC's specifications and instructions. The instructions included locating the reservoir port horizontally, or on the side of, the brake master cylinder, to accommodate other parts. The brake master cylinder piston was made of a zinc alloy and a coating was applied to the piston's surface. The piston spring was made of steel.

It is undisputed that Schall purchased his 2007 GSX-R in the fall of 2012 from a previous owner. Schall says that he began regularly riding the motorcycle around May 2013 and that he did not have any issues with the brakes that he was aware of prior to the evening of his accident. On the night of July 19, 2013, Schall rode his motorcycle to a church group function in a rural area of Daviess County, Kentucky. He followed his neighbor to the party where they stayed for several hours. After 10:00 p.m., Schall stated that he saw his neighbor leaving the party and that he left right behind him. As Schall was driving eastbound on Kentucky Highway 142, a rural two-lane road, he encountered a curve. Though there is no definitive proof of his speed, Schall testified that he did not think he was traveling too fast to take the curve. Schall also testified that he was aware that he was approaching a curve because he saw his neighbor's taillights disappear for a moment. As he was navigating the curve, Schall claims that he went to apply his front brake and down shift, but the bike was not stopping. Schall explained that he thought he applied as much force to brake as he could and then attempted to apply his back brake. Upon applying his back brake, Schall stated that he felt the back tire lock up and decided his best option was to navigate the bike toward a cornfield on the opposite side of the road. Unbeknownst to Schall, a large drainage ditch lined the road before the cornfield. As Schall left the roadway, he encountered the ditch and crashed.

Emergency vehicles responded to the incident and transported Schall to Owensboro Regional Medical Center. He was thereafter airlifted to Jefferson Hospital in Philadelphia, Pennsylvania. Due to a spinal fracture, Schall is now paralyzed from the sternum down. The police report associated with Schall's accident identified the cause of the wreck as "inattention." No inspection of Schall's motorcycle was performed until April 14, 2014. The parties dispute why it took nine months for the inspection to occur.

Six months after Schall's accident, he received a notice from SMAI stating that the GSX-R front brakes were defective, and as a result, stopping distances could be extended. The timeline of when Defendants became aware that the GSX-R was experiencing brake performance issues, when they understood the cause of the problem, and when they decided what would be necessary to remedy it are central issues in this case. However, much of the timeline of the eventual recall is undisputed.

On October 18, 2013, SMAI notified the National Highway Transportation Safety Administration ("NHTSA") of a recall of certain Suzuki motorcycles, including model years 2004 through 2013 of the GSX-R600, manufactured by SMC. In its notice to the NHTSA, SMAI advised:

> After a long-term service life of the motorcycle without changing the brake fluid, the brake fluid can deteriorate and absorb moisture. The brake piston inside the front brake master cylinder of some motorcycles may not have uniform surface treatment. This combination of conditions can lead to corrosion of the brake piston. Corrosion of the brake piston generates gas, which may not be adequately purged from the master cylinder due to the side position location of the reservoir port. Gas remaining in the master cylinder can affect braking power by reducing proper fluid pressure transmission to the front brake. Over time, as gas continues to slowly accumulate above the reservoir port, the front brake lever may develop a "spongy" feel and stopping distances may be extended, increasing the risk of a crash.

[DN 203-3 at 4]. SMAI advised NHTSA that to address the above condition, it would take the following action:

> Suzuki distributors will conduct a safety-related recall campaign to replace the front brake master cylinder on affected motorcycles with a redesigned part that has the reservoir port at the top location of the master cylinder to allow better purging of gas, and has improved surface treatment for the brake piston. Several associated parts will also be replaced. SMAI currently anticipates that it will notify dealers about the details of the recall during the week of October 28, 2013, and will notify owners about the recall during the week of November 4, 2013.

*Id.* Thereafter, on November 18, 2013, SMC, through SMAI, began notifying riders like Schall of the defect through a recall notice.

On July 17, 2014, Schall filed a lawsuit against SMC, SMAI, and Nissin. The next day, Schall submitted an Amended Complaint. Therein, he alleges that all three defendants are liable for design and manufacturing defects under theories of both strict liability and negligence, negligent failure to warn, and negligent advertising, distribution, and promotion. Defendants filed a series of motions in this case in May 2019—including motions to determine the applicable law, nine motions to exclude Schall's expert testimony, motions for partial summary judgment, SMAI's separate motion for summary judgment, and SMAI, SMC, and Nissin's motions for summary judgment. In the instant Motions, Defendants move for summary judgment on all of Schall's claims.

## II.    STANDARD OF REVIEW

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying the portion of the record that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

4

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252.

### III.    DISCUSSION

SMC moved with SMAI for summary judgment on each of Schall's claims. [DN 203]. Nissin independently moved for the same. [DN 182]. It is worth noting at the outset that, in a corresponding Memorandum Opinion and Order, the Court granted SMAI's Motion for Summary based on the applicability of Kentucky's Middleman statute as to all claims except negligent post-sale failure to warn. Accordingly, the reference to "Defendants" in the discussion of Schall's strict liability and negligence-based product liability claims as well as the negligent misrepresentation claim refer exclusively to SMC and Nissin. The reference to "Defendants" in the discussion of Schall's negligent failure to warn claim refers to all three defendants.

Schall advances manufacturing and design defect claims under theories of both strict liability and negligence. [DN 5 ¶¶ 41–52]. These are related causes of action in that both require a plaintiff to prove that the relevant product was defective and the legal cause of the injury. *See Tipton v. Michelin Tire Co.*, 101 F.3d 1145, 1150 (6th Cir. 1996) (holding that under Kentucky law, theories of negligence or strict liability both require that a jury first find the product was

defective); *Holbrook v. Rose*, 458 S.W.2d 155, 157 (Ky. 1970) (holding that whether the action involves negligent design, negligent failure to adequately warn, or the sale of a defective product that is unreasonably dangerous because of an inherent defect or inadequate warning, in every instance, the product must be a legal cause of the harm). However, they also have distinguishing elements. In Kentucky, products liability focuses on the strict liability of a defendant for inadequacies in the quality of the product, whereas negligence liability focuses on the conduct of the actor. *Montgomery Elevator Co. v. McCullough by McCullough*, 676 S.W.2d 776, 780 (Ky. 1984). The Court addresses Schall's strict liability claims first.

### A. Strict Liability-Based Claims

#### 1. Manufacturing Defect

Schall first asserts a claim for a manufacturing defect based on the uneven application of coating applied to the surface of the piston within the brake master cylinder. [DN 5 ¶¶ 42–43]. As a result of the uneven application, Schall alleges corrosion was able to occur in the presence of brake fluid thereby causing the generation of hydrogen gas within the braking system. [*Id.* at 43]. Schall further claims that the generation of hydrogen gas reduced the capacity of the front brake rendering it unreasonably dangerous. [*Id.*]. Defendants move the Court to grant summary judgment on Schall's strict liability-based manufacturing defect claim on several bases. First, Defendants argue that Schall has no reliable evidence that his motorcycle's piston was one of the pistons that received inadequate surface treatment and was unreasonably dangerous as a result because he has no admissible expert testimony on the point and, even if his experts are permitted to testify, none of them identified inadequate surface coating during their inspection of Schall's piston. [DN 182 16–20; DN 203 at 26–28]. Additionally, Defendants argue that Schall cannot prove that a defect in the GSX-R caused his accident—a required showing for both manufacturing

6

and design defect claims. [DN 182 at 26–29; DN 203 at 28–32]. Finally, Nissin argues that Schall cannot rely on Suzuki's recall of the GSX-R as proof of a manufacturing defect because the recall qualifies as a subsequent remedial measure, inadmissible under FED. R. EVID. 407. [DN 182 at 20–23].

Under Kentucky law, a plaintiff alleging a manufacturing defect must show that the product was "in a defective condition because it was not manufactured or assembled in accordance with its specifications" and that the condition caused the alleged injuries. *See Greene v. B.F. Goodrich Avionics Sys., Inc.*, 409 F.3d 784, 788 (6th Cir. 2005) (applying Kentucky law); *Bosch v. Bayer Healthcare Pharms., Inc.*, 13 F. Supp. 3d 730, 743–44 (W.D. Ky. 2014). A manufacturing defect claim requires the jury to determine whether the product failed because of an error in the process of manufacture or assembly. *Greene*, 409 F.3d at 788 (citing *Ford Motor Co. v. McCamish*, 559 S.W.2d 507, 509–11 (Ky. Ct. App. 1977)).

Kentucky has adopted the Restatement (Second) of Torts § 402A. *See Dealers Transport Co. v. Battery Distrib. Co.*, 402 S.W.2d 441, 446–47 (Ky. App. 1965). "Under § 402A, the defendant is held strictly liable if the plaintiff proves the product was 'in a defective condition unreasonably dangerous to the user or consumer.'" *Greene*, 409 F.3d at 788–89 (quoting *Montgomery Elevator Co. v. McCullough by McCullough*, 676 S.W.2d 776, 780 (Ky. 1984)). "Unreasonably dangerous" means "a product that is 'dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.'" *Greene*, 409 F.3d at 789 (quoting Restatement (Second) of Torts § 402A cmt. i). "Defective" means "that the product does not meet the reasonable expectations of the ordinary consumer as to its safety." *Greene*, 409 F.3d at 789 (quoting *Worldwide Equip., Inc. v. Mullins*, 11 S.W.3d 50, 55 (Ky. Ct. App. 1999)); *see also*

*Waltenburg v. St. Jude Med., Inc.*, 33 F. Supp. 3d 818, 835 (W.D. Ky. 2014); *Bosch*, 13 F. Supp. 3d at 743–44.

Defendants' first argument—that Schall has no reliable evidence to support his manufacturing defect claim—is moot. Defendants motioned separately to exclude Schall's experts, and the Court denied each of those motions as to the experts' testimony related to a manufacturing defect. Defendants' second argument is that, even if Schall's experts are permitted to testify, they do not have direct evidence that the surface coating on the piston in Schall's brake master cylinder was inadequate. However, there is ample circumstantial evidence that advances this same point. Defendants argue that hydrogen gas only generates where corrosion occurs, and that corrosion only occurs where the zinc piston in the front brake cylinder did not receive adequate surface coating. Schall designated experts who testified that, upon inspection of his brake master cylinder, hydrogen gas was discovered, as well as clear corrosion of the piston.

Defendants next argue that Schall does not have reliable evidence that his brake piston was unreasonably dangerous. As discussed above, to be unreasonably dangerous, a product must be "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." Restatement (Second) of Torts § 402A cmt. i. As is discussed in further detail below, the Court is persuaded at this stage by the evidence in the record that direct contact between a zinc piston and DOT 4 brake fluid—a condition caused by a failure to adequately cover the zinc piston with the protective coating—creates an unreasonably dangerous condition, unknown to consumers, that hydrogen gas will generate within the brake system and cause diminished braking capacity and increased stopping distance.

Finally, Defendants devote great portions of their briefs to the argument that Schall cannot rely on the recall of the GSX-R as evidence of the existence of a manufacturing defect because the notice qualifies as a subsequent remedial measure, inadmissible under FED. R. EVID. 407. The Court does not rely on the recall notice in denying Defendants' Motions on this score. Schall submitted well over seven hundred pages of evidence related to the Motions for Summary Judgment. Further, it is clear that he does not intend to rely on the recall notice as the sole evidence for any of his claims. That being said, Defendants are correct that Rule 407 will be applicable in this case to the extent that Schall intends to offer the recall notice to prove Defendants' negligence or culpable conduct. *See Bryan v. Emerson Elec. Co.*, No. 87-6027, 1988 WL 90910, at *2 (6th Cir. Sept. 1, 1988). The notice may very well be admissible for other purposes that can be addressed if and when issues arise at trial.

In order to prove a manufacturing defect, as with any of his product liability claims, Schall must prove causation. As both parties discuss causation following their arguments regarding theories of strict liability and negligent manufacturing and design defect, the Court does the same.

Having reviewed the record, the Court is convinced that genuine issues of material fact remain as to whether Schall's front brake master cylinder suffered from a manufacturing defect as a result of the uneven application of a surface coating to the system's piston.

### 2. Design Defect

Schall next alleges that the front brake master cylinder of the Suzuki GSX-R was defectively designed based on its use of incompatible materials within the front brake cylinder and the horizontal location of the port. Defendants move for summary judgment on this claim arguing that Schall's design defect claim fails for several reasons: (1) Schall's experts are unqualified to prove the existence of a design defect; (2) the GSX-R is presumed not defective under Kentucky's

Product Liability Act and Schall has not produced evidence to rebut that statutory presumption; (3) Schall has not established the GSX-R was unreasonably dangerous at the time of sale; (4) Schall's proposed alternative design would not have prevented the accident; and (5) Schall cannot prove that the design defect proximately caused his accident. [DN 182 at 14–15, 23–29; DN 203 at 17–26, 28–32].

Under Kentucky law, to prevail in a strict products liability action, a plaintiff must establish: "(1) that there is a product, which is (2) in a defective condition unreasonably dangerous to the user or consumer or his property, and (3) which reaches the user or consumer without substantial change in the condition in which it is sold; (4) that the product is sold by one who is engaged in the business of selling such a product which (5) results in physical harm to the ultimate user or consumer or his property." *Bosch v. Bayer Healthcare Pharms., Inc.*, 13 F. Supp. 3d 730, 740 (W.D. Ky. 2014) (citations omitted). A plaintiff also must establish that there was "an alternative, safer design that is practicable under the circumstances." *Id.*

### a. Zinc Piston

Schall first challenges Defendants' decision to use "incompatible materials" in the design of the GSX-R front brake master cylinder—namely, a zinc piston, steel spring, and DOT 4 brake fluid—and allowed those materials to have regular contact. [DN 241 at 28–31]. Elements one, three, and four are not at issue. Defendants instead focus their attention on Schall's inability to prove that the brake cylinder was in a defective condition unreasonably dangerous to Schall, as well as Schall's inability to prove causation. As mentioned above, the Court addresses causation after discussing Schall's negligence and strict liability product claims.

As to the product's unreasonably dangerous, defective condition, Defendants first assert that expert testimony is required to prove a design defect claim if the product is complex.

Defendants maintain that Schall has no competent expert evidence because his experts are unqualified to testify about the existence of a design defect. [DN 182 at 24–25; DN 203 at 18–19]. As above, the Court previously denied Defendants' motions to exclude Schall's experts' testimony on this score. Accordingly, the first argument is moot.

Defendants next argue that the GSX-R's brake master cylinder is presumed not defective pursuant to Kentucky's Product Liability Act. [DN 182 at 14–15; DN 203 at 19–20]. Defendants specifically cite to KRS § 411.310. That section provides for presumptions in product liability actions and states as follows:

> (1) In any product liability action, it shall be presumed, until rebutted by a preponderance of the evidence to the contrary, that the subject product was not defective if the injury, death or property damage occurred either more than five (5) years after the date of sale to the first consumer or more than eight (8) years after the date of manufacture.
> (2) In any product liability action, it shall be presumed, until rebutted by a preponderance of the evidence to the contrary, that the product was not defective if the design, methods of manufacture, and testing conformed to the generally recognized and prevailing standards or the state of the art in existence at the time the design was prepared, and the product was manufactured.

KRS § 411.310. Defendants aver that the GSX-R meets both criteria for a presumption of no defect. First, they maintain, the first consumer purchase of the motorcycle was more than five years before Schall's crash in July 2013. Additionally, Defendants argue that the subject brake master cylinder conformed to the generally recognized and prevailing standards within the front brake master cylinder industry at the time it was designed and manufactured. That being the case, Defendants claim they are entitled to the presumption and that Schall has not produced evidence to rebut that statutory presumption. However, "'[t]he statutory presumptions of KRS § 411.310 do no more than leave the burden of proof with [Schall] to prove that the [FBMC] was defective.'" *Boom Edam, Inc. v. Saunders*, 324 S.W.3d 422, 432 (Ky. Ct. App. 2010) (quoting *Leslie v. Cincinnati Sub-Zero Prods., Inc.*, 961 S.W.2d 799, 803 (Ky. Ct. App. 1998)). Once a presumption

11

is rebutted, material issues of fact exist as to whether the defectiveness caused or contributed to the plaintiff's injuries. *See Smith v. Louis Berkman Co.*, 894 F. Supp. 1084, 1091 (W.D. Ky. 1995).

Schall submitted substantial evidence that the choice of materials used in the brake master cylinder renders the component defective and unreasonably dangerous. Several experts' reports and depositions contain opinions and testimony that zinc is a highly corrosive material, not used in brake systems because of its incompatibility with brake fluids. The opinions and testimonies explain the dangerous nature of corrosion causing hydrogen gas generation in a brake system. The experts rely on both personal experience and academic research to support their positions. Additionally, Schall submitted brake fluid data sheets which note that zinc is incompatible with the fluid. Finally, Schall submitted an internal document from SMC's motorcycle group concerning the use of zinc in brake systems. The specific evidence the Court finds relevant, for the parties' reference, is outlined in great detail in the Court's corresponding Memorandum Opinion and Order addressing Defendants' Motions for Partial Summary Judgment with regard to punitive damages. At this stage, the Court finds that Schall rebutted any presumption of the brake master cylinder not being defective—leaving genuine issues of material fact. *Id.*

As to Schall's ability to prove that there was an alternative, safer design that was practicable under the circumstances, he has also done that. Schall submitted evidence that an alternative piston material—namely, aluminum—could have been used, that the piston could have been fitted with a rubber cap to prevent contact with the incompatible materials, or that a "sacrificial anode" could have been utilized. Expert testimony supports Schall's position that a safer alternative design existed and was practicable at the time of production. Schall's experts opined that had an alternative design been used, corrosion of the piston would not have occurred or resulted in the generation of hydrogen gas.

At this stage, the record before the Court reveals that Schall rebutted any presumption applicable to this action, as well as genuine issues of material fact as to whether there was a design defect in the GSX-R based on the materials used in the brake design.

### b. Horizontal Port

Next, Schall alleges that the subject brake master cylinder was defective and unreasonably dangerous due to the horizontal, side location of the return port to the reservoir tank. [DN 5 ¶ 44]. Schall alleges this design did not allow for the adequate purging of gas from the master cylinder, thereby decreasing the performance of the braking system upon accumulation of hydrogen gas. [*Id.*].

As with Schall's design defect claim premised on the selected materials, elements one, three, and four are not at issue with regard to this claim. Defendants instead focus their attention on Schall's inability to prove that the brake cylinder was in a defective condition unreasonably dangerous to Schall, as well as Schall's inability to prove causation as to the port location. As above, Defendants claim Schall lacks competent expert testimony on this score and point to the presumption in product liability cases. For the same reasons previously discussed, Schall does have competent expert testimony on this score and any applicable presumption is overcome by the evidence in the record.

Schall, once again, submitted sufficient evidence to support the position that the side location of the reservoir port was defective and unreasonably dangerous. The evidence available in the record satisfies Schall's burden of proof at this stage—thereby rendering any presumption under KRS § 411.310 irrelevant. Expert reports and depositions were submitted to the Court which include opinions that the side position of the reservoir port rendered the brake cylinder unable to purge unwanted air and gas. One of Schall's experts—a mechanical engineer—explained that the

inability to purge unwanted gas led to a diminished brake capacity—an unreasonably dangerous condition. That expert further opined that the side location was contrary to that which is required by competent safety-oriented engineering brake design practices. While Defendants may well have experts who intend to testify as to opposite conclusions, and evidence which supports their position, the Court cannot make credibility determinations at this stage. Instead, this is a matter best reserved for trial.

As to Schall's ability to prove that there was an alternative, safer design that was practicable under the circumstances, he has also done that. Schall submitted expert's report and testimony that an alternative design—with the reservoir port located vertically—could have been used, and in fact was the design adopted by Defendants when conducting the recall of the GSX-R. Evidence in the record supports Schall's position that a safer alternative design existed, was practicable at the time of production, and would have prevented Schall's accident and permanent injuries.

Viewing the evidence in a light most favorable to Schall, the Court believes genuine issues of material fact remain on whether the brake master cylinder was defectively designed and unreasonably dangerous due to the horizontal location of the port.

## B. Negligence-Based Claims

Schall alleges that Defendants were negligent and grossly negligent in the design, manufacture, testing, marketing, advertising, distribution, promotion, and selling of his 2007 Suzuki GSX-R600 and its braking system. [DN 5 ¶ 47].

Under Kentucky law, to succeed on a negligence claim, a plaintiff must establish that: (1) the defendant owed a duty of care to him; (2) the defendant breached its duty; and (3) the breach proximately caused his damages. *Bosch v. Bayer Healthcare Pharms., Inc.*, 13 F. Supp. 3d 730, 741 (W.D. Ky. 2014) (citing *Mullins v. Commonwealth Life Ins. Co.*, 839 S.W.2d 245, 247 (Ky.

1992)). Because Schall's negligent design and manufacture claims are premised on the same allegations as his strict liability claims, much of the Court's analysis above is equally applicable here. The Court addresses the different negligence claims separately for the sake of clarity.

### 1. Manufacturing Defect

Count II of Schall's Amended Complaint alleges that the Defendants had a duty to manufacture the surface coating of the piston consistent with the internal specifications, that Defendants breached that duty, and that his accident and accompanying injuries occurred as a result. [DN 5 ¶¶ 46–50, 52]. With respect to Schall's negligent manufacturing claim, the Court finds that Schall submitted evidence to support the contention that Defendants breached their duty of care as to the manufacture of the piston due to the inadequate surface coating. The evidence that Schall's specific piston deviated from the intended design—a fully intact surface coating—is the evidence of corrosion present within his brake master cylinder when it was inspected, as well as the presence of hydrogen gas within that same part. While Defendants take issue with the use of such evidence to prove that Schall's piston was negligently manufactured, it remains appropriate circumstantial evidence.

### 2. Design Defect

Count II of Schall's Amended Complaint also alleges that Defendants were negligent in the design of the 2007 Suzuki GSX-R and its braking system. [*Id.*]. The Court briefly addresses both design defect claims.

#### a. Zinc Piston

Schall submits that the Defendants owed a duty of care to Schall and like consumers, that the use of a zinc piston in combination with incompatible brake fluid breached the duty of care, and that the breach caused his accident and attendant injuries. [*Id.*]. As above, the Court finds

that, at this stage, Schall submitted substantial evidence to support the contention that Defendants breached their duty of care as to the design of the brake master cylinder by selecting zinc—a material known to be highly corrosive—for the brake's piston. Further, Schall submitted an expert report in which a product-safety manager and hazard control manager explained that Defendants were aware that replacing the master cylinder piston would correct the defective and unreasonably dangerous master cylinder system but failed to do so.

### b. Port Location

Finally, Schall argues that the Defendants were negligent and the GSX-R suffered from a design defect because of the reservoir port being horizontally located—a design decision which prevented unwanted gases from purging completely from the brake system. [*Id.*]. The Court addressed this argument in more detail above, but the Court is persuaded that genuine issues of material fact remain on this claim. Schall submitted sufficient evidence that Defendants owed a duty and breached that duty by locating the reservoir port horizontally rather than vertically—a design which failed to allow full purging of unwanted hydrogen gas.

### C. Causation

The remaining element, relevant to each of the above claims, is causation. The parties chose to reserve discussion of causation and the Court is addressing the issue in kind. Defendants both maintain that Schall cannot prove that a defect in his brake master cylinder caused his accident. [DN 182 at 26–29; DN 203 at 28–32]. Specifically, Defendants maintain that to prove causation, Schall must present expert testimony and Schall does not have reliable expert testimony. As has been noted, Defendants' Motions to exclude Schall's expert testimony have been denied with regard to testimony concerning causation. Even if Schall's experts are permitted to testify, Defendants still argue that he cannot satisfy his showing for causation.

16

Under Kentucky law, a plaintiff has the burden of establishing causation in claims of strict liability, as well as negligence. *Morales v. Am. Honda Motor Co.*, 71 F.3d 531, 537 (6th Cir. 1995) (citing *Huffman v. SS. Mary & Elizabeth Hosp.*, 475 S.W.2d 631, 633 (Ky. 1972); *Holbrook v. Rose*, 458 S.W.2d 155, 157 (Ky. 1970)). Causation or proximate cause is determined by the substantial factor test: was the defendant's conduct a substantial factor in bringing about plaintiff's harm? *Id.* (citing *Deutsch v Shein*, 597 S.W.2d 141, 144 (Ky. 1980), *abrogated on other grounds by Osborne v. Kenney*, 399 S.W.3d 1 (Ky. 2012)). "Causation may be proved by circumstantial evidence, but 'the evidence must be sufficient to tilt the balance from possibility to probability.'" *Morales v. Am. Honda Motor Co.*, 151 F.3d 500, 507 (6th Cir. 1998) (quoting *Morales*, 71 F.3d at 537).

Defendants argue that Schall has no reliable evidence that corrosion or hydrogen was in his brake master cylinder at the time of his accident because there were no reliable tests or experiments performed. The Court disagrees. Schall submitted expert reports and depositions which contain opinions concerning the existence of corrosion within the braking system and the presence of hydrogen gas—the byproduct of such corrosion. Specifically, the experts explained that although the inspection and testing was not performed until April 2014, in their opinion the hydrogen gas would have also been present at the time of the accident. The evidence explained that because of the time of year—fall through spring—and the way in which the motorcycle was stored awaiting inspection would have caused, if anything, a decrease in the amount of hydrogen gas in the braking system rather than an increase as suggested by Defendants. Such circumstantial evidence may be properly used to establish causation. Schall also submitted expert evidence that the condition in his motorcycle would diminish the brake performance and increase the stopping distance.

Connecting the above evidence with Schall's accident, expert opinions and testimony were submitted to the Court which state that the defect present in Schall's motorcycle reduced its braking capacity and caused the crash. Defendants argue that even if Schall can prove that corrosion and hydrogen gas were present in his GSX-R's brake master cylinder on the day of his accident, he cannot prove that that defect was the probable cause of the accident. While Defendants may have alternative explanations for Schall's accident, at this stage, viewing the evidence in the record in a light most favorable to Schall, the Court is persuaded that such evidence tilts the balance from possibility to probability.

Finally, Defendants take issue with Schall's description of the accident. Schall maintains that prior to the evening of July 19, 2013, he had not experienced any issue with his brakes. Schall describes his accident as being caused by a sudden loss of front brake capacity. Defendants argue that this description of a sudden loss of brake pressure is at odds with the recall notice which described the defect as a slow onset of spongy front brakes. Schall submitted evidence from two experts, which the Court finds persuasive, that the stated recall condition and Schall's description of his accident are not mutually exclusive. The experts opine that a rider, like Schall, might not notice the defect during normal operation and would only discover it while riding when he needs a quick or significant braking response.

Viewing all of the evidence submitted in the light most favorable to Schall, there remain genuine issues of material fact on the manufacturing and design defect claims based on theories of both strict liability and negligence. Further genuine issues remain concerning the causation element of each claim. That being the case, summary judgment on these four claims would be improper. Accordingly, Defendants' Motions for Summary Judgment as to Schall's design and manufacturing defect claims under theories of both strict liability and negligence are **DENIED**.

**D. Negligent Failure to Warn**

Schall asserts the Defendants were negligent in their post-sale failure to warn and to conduct a recall of the subject motorcycle and its braking system. Specifically, Schall alleges that Defendants acted with negligence, gross negligence, and/or wanton and malicious disregard of his rights by failing to timely evaluate complaints about the subject motorcycle, failing to timely issue a recall, failing to timely notify the NHTSA, and by failing to timely notify owners of the dangerous condition. [DN 5 ¶ 51]. Defendants divide their opposition to this claim into two basic arguments—first, that there is no private right of enforcement of a manufacturer's reporting obligations to the NHTSA, and second, that Kentucky does not recognize a post-sale duty to recall or issue warnings. [DN 182 at 31–32; DN 203 at 35–37]. The Court addresses each argument in turn.

Defendants correctly point out that there is no private right of action to enforce a manufacturer's reporting requirements to the NHTSA. Schall does not dispute the state of the law as to this point. Instead, he states that the "NHTSA requires manufacturers to disclose safety defects to NHTSA within five days of learning of them," and that it "is clear that Defendants failed to do so here." [DN 241 at 40]. Schall goes on to agree with Defendants concerning the private right of action. [*Id.* at 40 n.142]. Specifically, Schall states that he put forth the claim that Defendants' conduct violated NHTSA's 5-day requirement to preserve the issue for appeal and suggests that the statute may still be used to evince the relevant industry reporting standard. [*Id.*].

Defendants next argue that Kentucky does not recognize a duty by a manufacturer to recall, retrofit, or warn about a product that was not defective when sold. Because Defendants argue their product was not defective, they maintain that summary judgment is appropriate. [DN 182 at 32; DN 203 at 32–35]. Schall in turn responds that his brake master cylinder was defective at the time

19

of sale and that when Defendants became aware of the defect, they actively concealed such from their customers. [DN 241 at 38–41]. An overview of several recent cases is necessary to address this issue.

In 1995, the Kentucky Supreme Court decided *Clark v. Hauck Mtg. Co.*, 910 S.W.2d 247 (Ky. 1995), *overruled on other grounds by Martin v. Ohio Cnty. Hosp. Corp.*, 295 S.W.3d 104 (Ky. 2009). There, the court addressed an appeal from the widow of a man killed in a workplace accident. *Id.* at 250. More specifically, the court was asked to determine whether the trial judge committed reversible error through use of a jury instruction that required a finding that a product was both defective *and* had inadequate warnings in order to render a verdict in favor of the plaintiff. *Id.* at 250–51. The court concluded that the lower court had committed reversible error because the instruction improperly linked two distinct theories of recovery and thus misstated the burden of proof. *Id.* at 251. In that opinion, the court stated

> The duty of ordinary care embraces such questions as the duty of the manufacturer to review design and if he knew or should have known that his design was defective to make an effort to notify the purchasers of his equipment of these findings subsequent to the sale of the product.

*Id.* Schall maintains that this post-sale duty to warn provides the basis for his claim. Defendants, in turn, cite to a case from the Eastern District of Kentucky—*Cameron v. DaimlerChrysler Corp.*—and argue that Kentucky has no such post-sale duty to warn. No. 5:04-CV-24, 2005 WL 2674990 (E.D. Ky. Oct. 20, 2005).

In *Cameron*, a plaintiff alleged three causes of action concerning her Jeep Wrangler—first, a design defect claim, second, express and implied warranty claims, and third, a post-sale failure to warn claim. *Id.* at * 1. The court, citing approvingly to *Clark*, noted that "[i]n Kentucky, 'liability may be imposed on the manufacturer of a defective product under a variety of theories. Liability may result from defective design; for manufacturing defects; and for failure to warn.'"

20

*Id.* at *3 (citing *Clark*, 910 S.W.2d at 250). However, the court goes on to address the plaintiff's post-sale failure to warn claim and appears to change its tune. The court, referring to a 2003 Kentucky Supreme Court case, *Ostendorf v. Clark Equip. Co.*, 122 S.W.3d 530 (Ky. 2003), discussed in detail below, concludes that reading *Ostendorf* in its entirety "indicates that Kentucky would not adopt a post-sale failure to warn cause of action." *Id.* at *7. The court reasoned that because the Kentucky Supreme Court in *Ostendorf* declined to adopt the duty to retrofit, "it is reasonable to assume that the court would similarly reject a post-sale duty to warn for the same reasons." *Id.* This Court, however, believes that *Cameron* misinterpreted the analysis of *Ostendorf*.

In *Ostendorf v. Clark Equip. Co.*, the Kentucky Supreme Court addressed whether Kentucky would recognize a post-sale duty to retrofit. 122 S.W.3d 530 (Ky. 2003). The court considered the rationale of jurisdictions where such a duty is recognized but ultimately sided with the majority of jurisdictions which recognize no such duty. *Id.* at 534. In so holding, the court discussed a variety of post-sale obligations—such as a duty to warn of later-discovered defects or foreseeable misuses and the duty to recall a defective product. *Id.* at 536. The court noted that numerous cases impose a duty to warn of later discovered defects but noted that the instant case did not present the issue of a duty to warn. Taking extra care, the court noted that its "discussion addresses that topic only generally, as it relates to the issues in this case." *Id.* at 536 n.1. In fact, after concluding that Kentucky recognized no post-sale duty to retrofit, the court went on to explain the following:

> When a product is defective, a manufacturer may be subject to one of these post-sale duties. The nature of the defect will dictate the appropriate remedy: a defect that may result in a few minor injuries may only require a warning, whereas a defect that may result in serious injury or death could require more. These remedial measures can be seen as "a continuum of post-sale duties which the law might impose . . . ." *Gregory v. Cincinnati Inc.*, 538 N.W.2d 325, 341 (Mi. 1995).

21

*Id.* at 536. Based on this discussion, and the Kentucky Supreme Court's previous holding in *Clark*, the Court believes that the *Cameron* court overgeneralized the *Ostendorf* opinion's refusal to recognize a post-sale duty to retrofit. This conclusion is bolstered by a 2015 Western District of Kentucky opinion.

In *Jackson v. E-Z-GO Div. of Textron, Inc.*, the court addressed the defendant's motion for a protective order concerning plaintiff's discovery requests. No. 3:12-CV-154-TBR, 2015 WL 4464098 (W.D. Ky. July 21, 2015). There, a plaintiff sued alleging that a golf cart which killed her child was defectively designed and that the defendant failed to provide adequate warnings. *Id.* at *2. The plaintiff sought discovery of incident reports collected by defendant over a span of years because she believed the reports would show the defendant was aware of the alleged defects. *Id.* In addressing the temporal limits of the discovery request, the defendant argued that because products liability plaintiffs must prove that a product was defective when the manufacturer sold it, the defendant should not have to turn over any incident reports from after the sale of the golf cart to plaintiff in 1993. *Id.* at *9. The court disagreed. The opinion explained that because "Kentucky law holds that manufacturers could have a post-sale duty to warn of later-learned-of defects, it would be improper to impose [such] a temporal limit on discovery." *Id.* at *10.

Based on an extensive review of the cases, the Court determines that Kentucky does recognize a post-sale duty to warn claim for products that were defective when sold. As is mentioned above, Defendants are not entitled to summary judgment on Schall's design defect claim at this stage as there remain genuine issues of material fact. Having determined that Kentucky does recognize a post-sale failure to warn claim for products that were defective when sold and that genuine issues of fact remain on Schall's design defect claim, it is now necessary to determine whether Defendants are entitled to summary judgment on Schall's failure to warn claim.

A manufacturer is negligently liable for failure to warn if "it knew or had reason to know that its product was likely to be dangerous, had no reason to expect the product's users would be aware of that danger, and failed to exercise reasonable care to alert users of that danger." *Smith v. Univar USA, Inc.*, No. 12-134-ART, 2013 WL 1136624 (E.D. Ky. Mar. 18, 2013) (citing *Tipton v. Michelin Tire Co.*, 101 F.3d 1145, 1149–50 (6th Cir. 1996)). Nissin argues that Schall fails to show that they were negligent concerning the investigation and recall. [DN 182 at 32]. SMC and SMAI simply maintain that because there is no post-sale duty to recall or warn at all, there can be no duty to do so in a "timely" manner. [DN 203 at 35]. Still yet, the Court addresses the evidentiary question as to all Defendants.

Schall presented sufficient evidence that the Defendants knew, or had reason to know, that their product was likely to be dangerous. By way of example, it is undisputed that by April 2013, at the latest, the Defendants understood that gas was accumulating in the front brake master cylinder—a dangerous condition causing issues with the reactivity of the motorcycle's front brake. [DN 182 at 6; DN 203 at 6; DN 241-31 at 1]. Defendants also knew that 5-10% of the pistons in the brake master cylinder received surface coating during manufacture that did not meet Defendants' internal specifications. [DN 182 at 6; DN 203 at 6; DN 241-35]. It is also clear that at this same time Defendants believed there to be a "serious safety issue" requiring an active response. [DN 241-2 at 3; *see also* DN 241-31 at 1, DN 241-34 at 1]. An internal document listed both the merits and risks of implementing a recall and choosing not to do so. [DN 241-2 at 4]. Listed as a risk of not implementing a recall, the document noted that "[i]f the problem becomes public in the future, Suzuki Head Office will be held to account for its response. (Concealment of recall, breach of obligation to notify)." [*Id.*]. The documents submitted to the Court—including

23

Schall's experts' reports and depositions—indicate that the Defendants understood that they had a serious safety issue on their hands months before the first indication was made to the public.

As to whether users would be aware of the danger, Schall presented evidence that Defendants knew users would not have such knowledge. Specifically, an internal memorandum from SMC's executive specifically stated that customers and dealers did not believe the reduced brake pressure was a product defect but instead was a maintenance issue that could be remedied by vehicle maintenance. [*Id.* at 1]. Finally, Schall also presented evidence that, despite knowledge of the problem, Defendants failed to warn consumers of the brake issue and did not begin the process of issuing a recall notice until October 2013. [DN 241-3]. Further, Schall presented evidence that the delay occurred not because Defendants were attempting to understand the conditions that caused the phenomenon but because they were attempting to manufacture an alternative cause for the issue—specifically, user error. [DN 241-2; DN 241-46; DN 241-47; DN 241-48 at 1; DN 241-49].

Nissin specifically argues that it had no duty to issue a recall for the GSX-R. [DN 182 at 32]. That may be the case, but Nissin reads Schall's Amended Complaint too narrowly. The Complaint alleges that Defendants "failed to timely evaluate complaints of problems" with the subject GSX-R, failed "to timely issue a recall," failed to timely notify the NHTSA, and failed "to timely notify owners of the affected Suzuki motorcycles of the defective and dangerous condition of the motorcycles and braking systems." [DN 5 ¶ 51]. Nissin cannot skirt liability by reframing Schall's allegations. Nissin makes no argument as to why it, as a component parts manufacturer, had no post-sale duty to warn and there appears to be no such reason at this time. *See Embs v. Pepsi-Cola Bottling Co. of Lexington, Ky., Inc.*, 528 S.W.2d 703, 705 (Ky. 1975). More generally,

Defendants maintain that the prolonged response was a result of the complex set of variables required to cause the gas build-up phenomenon. [DN 182 at 32–33].

Viewing the evidence submitted to the Court in the light most favorable to Schall, there remain genuine issues of material fact on each element of the post-sale failure to warn claim as to each of the three Defendants. These issues are best reserved for trial. This being the case, Defendants' Motions for Summary Judgment as to Schall's negligent failure to warn claim are **DENIED**.

### E. Negligent Misrepresentation

Finally, Schall's Amended Complaint asserts that the Defendants are liable for the manufacturing, advertising, and distribution of his 2007 Suzuki GSX-R600 and its braking system. [DN 5 ¶¶ 42, 47]. Both sets of Defendants move for summary judgment on this claim, although they are unclear as to whether Schall is maintaining the cause of action or whether he has abandoned it due to lack of evidence. [DN 182 at 30–31; DN 203 at 37–38]. In his Response, Schall makes brief mention of this claim. The total discussion of this claim states that he "does not oppose dismissal of claims against Nissin for negligent manufacturing, advertising, or promotion of the GSX-R motorcycle[.]" [DN 241 at 38 n.137]. Because Schall does not oppose dismissal of this claim against Nissin, the claim is dismissed and does not require further discussion. However, Schall makes no mention of his intentions for this claim against SMC. [DN 241 at 38; DN 277 at 14], accordingly the Court will address it under to the summary judgment standard.

SMC contends that Schall appears to be asserting a negligent misrepresentation claim. [DN 203 at 37 n.26]. The Court agrees with this understanding and addresses Schall's allegations under that theory. The Restatement (Third) of Torts § 9 governs such a claim. In *Morris Aviation, LLC*

25

*v. Diamond Aircraft Indus., Inc.*, the Sixth Circuit pointed to the Kentucky Supreme Court's acknowledgement in *Giddings & Lewis v. Indus. Risk Insurers* of Section 9 of the Restatement (Third) of Torts: Products Liability, which provides:

> One engaged in the business of selling or otherwise distributing products who, in connection with the sale of a product, makes a fraudulent, negligent, or innocent misrepresentation of material fact concerning the product is subject to liability for harm to persons or property caused by the misrepresentation.

536 F. App'x 558, 567–68 (6th Cir. 2013) (quoting *Giddings & Lewis v. Indus. Risk Insurers*, 348 S.W.3d 729, 746 n.11 (Ky. 2011)); *see also Stanley v. Bayer Healthcare Pharm. Inc.*, No. 3:15-CV-00230-JHM, 2015 WL 4511973, at *3–4 (W.D. Ky. July 24, 2015).

Under Kentucky law, a plaintiff must identify the false or misleading information provided by the specific defendant. *See Gaunce v. CL Med. Inc.*, No. 5:14-346-DCR, 2015 WL 893569, at *3 (E.D. Ky. Mar. 2, 2015); *see also Giddings & Lewis*, 348 S.W.3d at 746. Additionally, a plaintiff must demonstrate: (1) the subject plaintiff was a reasonably foreseeable recipient of the information; (2) he justifiably relied on the information; (3) he exercised reasonable care in relying on the information; and (4) the false statements allegedly made by the defendant were a proximate cause of the plaintiff's damage. *Presnell Constr. Managers, Inc. v. EH Constr., LLC*, 134 S.W.3d 575, 580 (Ky. 2004).

Schall presented no evidence to the Court to support any of these elements. The best support for this claim comes in Schall's allegation that despite making the decision in September 2012 to relocate the port on the brake master cylinder and in April 2013 to fix the surface coating, SMC continued to manufacture GSX-R motorcycles with the side facing reservoir port through July 2013. [DN 241 at 14]. Even viewing that statement in the light most favorable to Schall, it is insufficient to sustain a negligent misrepresentation claim on summary judgment. Because no genuine issues remain, summary judgment is **GRANTED** as to this claim

## IV.    CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Defendants' Motions for Summary Judgment [DN 182; DN 203] are **GRANTED** as to Schall's negligent misrepresentation claim and **DENIED** as to Schall's manufacturing and design defect claims under theories of both strict liability and negligence as well as to Schall's negligent failure to warn claim.

Joseph H. McKinley Jr., Senior Judge
United States District Court

March 31, 2020

cc: counsel of record